54 Cal.Rptr.3d 28 (2007)
147 Cal.App.4th 80
Harold L. BOSTICK, Plaintiff and Appellant,
v.
FLEX EQUIPMENT COMPANY, INC., Defendant and Appellant.
Gold's Gym, Inc., Cross-complainant and Respondent,
v.
Flex Equipment Company, Inc., Cross-defendant and Appellant.
Nos. B171567, B173455.
Court of Appeal of California, Second District, Division Three.
January 29, 2007.
*31 Smith, Chapman & Campbell, Steven C. Smith, William D. Chapman and Robert J. Hadlock, Santa Ana, for Plaintiff and Appellant.
Horvitz & Levy, David S. Ettinger, S. Thomas Todd, Encino; Callahan, McCune & Willis and John J. Tasker, West Los Angeles, for Defendant, Cross-defendant and Appellant.
No appearance for Cross-complainant and Respondent.
Certified for Partial Publication.[*]
*30 ALDRICH, J.

INTRODUCTION
Harold L. Bostick suffered severe, disabling injuries while working out at Gold's Gym, Inc. (Gold's Gym) on weight-lifting equipment manufactured by Flex Equipment Company, Inc. (Flex). Bostick sued both Flex and Gold's Gym. Gold's Gym cross-complained against Flex for equitable indemnity. The cross-complaint was severed for separate trial. Prior to the conclusion of the trial on the complaint, Bostick entered into a settlement with Gold's Gym for $7.3 million. The jury returned a verdict awarding Bostick nearly $3.3 million in economic damages and $13 million in noneconomic damages, and later awarded $1 in punitive damages. The jury apportioned 90 percent of the fault to Flex, 10 percent to Bostick, and 0 percent fault to "other entities." The trial court reduced Bostick's award against Flex by the full amount of the $7.3 million settlement and entered a judgment in favor of Bostick. Thereafter, the trial court entered judgment in favor of Gold's Gym on its cross-complaint against Flex for equitable indemnity in the full amount of the $7.3 million settlement.
Both Flex and Bostick appeal from the judgment. In its appeal, Flex challenges the $13 million verdict for noneconomic damages, contending the jury awarded punitive damages in the guise of damages for pain and suffering because of an instructional error. In his appeal, Bostick contends that Proposition 51 applies to this case with the result that Flex is only severally liable for Bostick's noneconomic damages. He argues further that the trial court erred in setting off the full amount of his $7.3 million settlement with Gold's Gym, because the setoff should be limited to that portion of the settlement attributable to economic damages only. Flex also appeals from the judgment on the cross-complaint *32 granting equitable indemnity in favor of Gold's Gym. It contends that the finding by the jury in the action on the complaint that the percentage of fault attributable to "other entities" was zero is not collateral estoppel and therefore is not binding on Flex in the Gold's Gym cross-action.
In the published portion of this opinion, we hold that the trial court did not err in reducing Bostick's award of damages by the full amount of his settlement with Gold's Gym. In reaching this conclusion, we follow Wimberly v. Derby Cycle Corp. (1997) 56 Cal.App.4th 618, 65 Cal.Rptr.2d 532 (Wimberly), which holds that Proposition 51,[1] which made liability for noneconomic damages several only rather than joint and several, does not apply in a strict products liability action involving a single indivisible injury because liability is imposed under this doctrine irrespective of fault. On this point, we disagree with the concurring opinion. Additionally, we hold with respect to Gold's Gym cross-action for equitable indemnity, that the jury's finding in the trial on the complaint, namely that the percentage of fault attributable to "other entities" was zero, is not collateral estoppel so as to bind Flex.
In the unpublished portion of the opinion, we hold that the trial court did not commit instructional error with respect to the award of noneconomic damages and there was no prejudice. Accordingly, we affirm the judgment on the complaint and reverse the judgment on the cross-complaint.

FACTUAL AND PROCEDURAL BACKGROUND

1. Factual Background

Bostick, at the time a 31-year-old law student, was exercising and lifting weights at a facility owned by Gold's Gym in Venice, California in January 2001 when he collapsed while doing squats using a Smith machine manufactured by Flex. A Smith machine has a barbell that rests on the user's shoulders and moves up and down between guide rods as the user performs squats by bending and extending his legs. On the machine Bostick was using, hooks attached to the barbell rested on pegs and supported the barbell when the machine was not in use. By rotating the barbell, the user could disengage the hooks, allowing the barbell to move up and down between the guide rods. Upon completing the exercise, the user could rotate the barbell to engage the hooks and support the barbell. There were pegs every six inches along the guide rods. The guide rods were 10 degrees from the perpendicular, so the barbell moved slightly toward the user as it traveled down.
Bostick was lifting over 300 pounds on the machine at the time of the accident. He had performed several sets of six to ten repetitions each at lower weights. He did not have another person standing by, known as a spotter, to relieve him of the weight if necessary. He was extending his legs and had almost reached a full extension when he noticed that something did not feel right, and collapsed to the floor. Bostick fell straight down under the weight of the barbell, which came to rest on his neck, pushing his head forward. He felt no pain and was unable to move his legs. He suffered a broken neck and severe injury to his spinal cord.
Bostick was hospitalized for three weeks in intensive and critical care, and then spent nine weeks at a rehabilitation hospital and seven months at a veterans' hospital. *33 He continued to receive outpatient rehabilitative care until January 2002, when he resumed his law school education. The injury rendered him severely disabled.

2. Trial Court Proceedings

Bostick filed a complaint against Gold's Gym and Flex in April 2001. His first amended complaint alleged counts against both defendants for negligence, strict liability for product defects and failure to warn, and breach of implied warranty. Defendants, in their answers, alleged as affirmative defenses that their liability to Bostick, if any, should be reduced in proportion to the comparative fault of other persons and that their liability for noneconomic damages should be several only pursuant to Civil Code section 1431.2. Defendants each filed a cross-complaint against the other seeking declaratory relief of a right of equitable indemnity. The court granted Bostick leave to file a second amended complaint, which he filed in November 2002, adding allegations to support an award of punitive damages. Bostick filed a third amended complaint naming Brunswick Corporation and Life Fitness (collectively, Life Fitness) as additional defendants who allegedly may have manufactured the exercise equipment. Life Fitness settled with Bostick before trial.
The jury trial commenced in June 2003. The court severed the cross-complaints from the complaint and tried only the complaint. The court granted a nonsuit in favor of Gold's Gym on the implied warranty count. After the close of evidence, involving five weeks of testimony, but before closing arguments, Bostick dismissed his negligence cause of action against Gold's Gym with prejudice and settled his products liability counts against Gold's Gym for $7.3 million.[2] The trial court granted a nonsuit motion on the breach of warranty claim. The court found that the settlement was in good faith and, pursuant to Code of Civil Procedure section 877.6,[3] dismissed Flex's cross-complaint against Gold's Gym.
The jury thereafter returned special verdicts in favor of Bostick and against Flex finding that there was a design defect or a failure to warn of a defect in the Smith machine, that Flex was negligent, that Bostick's comparative fault also contributed to his injury, and that Bostick suffered $3,274,966 in economic damages and $13 million in noneconomic damages. The jury found that the comparative fault of Flex was 90 percent, the comparative fault of Bostick was 10 percent, and the comparative fault of "other entities" was 0 percent. The jury also found by clear and convincing evidence that Flex was guilty of malice or oppression. In the second phase of trial, the jury awarded punitive damages of $1.
As noted, the trial court determined that Bostick's settlement with Gold's Gym was made in good faith. The court concluded that because Bostick's injuries were caused solely by a defective product and Flex and Gold's Gym were in the same chain of distribution, Wimberly, supra, 56 *34 Cal.App.4th 618, 65 Cal.Rptr.2d 532 compelled the conclusion that Proposition 51 did not apply. The court stated further that Bostick's settlement with Gold's Gym was based on strict products liability only because he had dismissed the negligence cause of action as against Gold's Gym, so the only basis of claimed liability common to both Gold's Gym and Flex was for strict products liability. The court, applying Wimberly, concluded that the claimed liability common to Gold's Gym and Flex was fully joint and several and therefore concluded that Flex was entitled to a setoff of the full amount of the $7.3 million settlement. The court entered judgment against Flex awarding Bostick a total of $16,274,966 in compensatory damages, reduced by 10 percent for his comparative fault, and further reduced by the $7.3 million setoff and by a $26,156 setoff for the settlement with Life Fitness, plus $1 in punitive damages, for a net award of $7,321,314.
Bostick moved to vacate the judgment and enter a new judgment with a reduced setoff for the Gold's Gym settlement and no setoff for the Life Fitness settlement. Flex moved for a new trial on the grounds, inter alia, the award of noneconomic damages was excessive. The court denied both motions. The court later entered a corrected judgment in favor of Bostick with no setoff for the Life Fitness settlement, awarding him a net total of $7,347,470. Bostick and Flex both appeal from the judgment (case No. B171567).
Gold's Gym then moved for judgment on the pleadings on its cross-complaint for equitable indemnity against Flex based on the jury's finding that Gold's Gym was without fault.[4] Gold's Gym argued that it was entitled to total equitable indemnity because Flex was solely responsible for Bostick's injury. The court granted the motion and entered a judgment against Flex awarding Gold's Gym $7.3 million. Flex appeals from that judgment (case No. B173455). The court denied Gold's Gym's motion for an award of attorney fees. We consolidated the two appeals for disposition in a single opinion.

DISCUSSION
1. Flex Has Not Shown Prejudicial Error with Respect to the Award of Noneconomic Damages[**]
2. A Defendant in a Strict Products Liability Action is Jointly and Severally Liable to the Plaintiff for Noneconomic Damages Because Liability Is Imposed as a Matter of Public Policy and is not Based On Fault

a. Strict Products Liability Principles

The doctrine of strict products liability imposes strict liability in tort on all of the participants in the chain of distribution of a defective product. (Greenman v. Yuba Power Products, Inc. (1963) 59 Cal.2d 57, 63, 27 Cal.Rptr. 697, 377 P.2d 897 (Greenman); Vandermark v. Ford Motor Co. (1964) 61 Cal.2d 256, 262-263, 37 Cal.Rptr. 896, 391 P.2d 168.) In first articulating this theory of liability, Justice Traynor in Escola v. Coca Cola Bottling Co. (1944) 24 Cal.2d 453, 150 P.2d 436 suggested that a manufacturer "incurs an absolute liability" for placing a product on the market, knowing it will be used without inspection, when that article proves to have a defect that causes injury (id. at pp. *35 461-462, 150 P.2d 436, italics added (cone, opn. of Traynor, J.)), i.e., the manufacturer would be liable "without reference to fault." (Malone, Contrasting Images of Tortsthe Judicial Personality of Justice Traynor (1961) 13 Stan. L.Rev. 779, 804.)
The chief justification for creating the strict products liability doctrine was "to insure that the costs of injuries resulting from defective products are borne by the manufacturers that put such products on the market rather than by the injured persons who are powerless to protect themselves." (Greenman, supra, 59 Cal.2d at p. 63, 27 Cal.Rptr. 697, 377 P.2d 897, citing Prosser, Strict Liability to the Consumer, 69 Yale L.J. 1099 & Escola v. Coca Cola Bottling Co., supra, 24 Cal.2d at p. 461, 150 P.2d 436 (cone. opn. of Traynor, J.).) Vandermark v. Ford Motor Co., supra, 61 Cal.2d 256, 37 Cal.Rptr. 896, 391 P.2d 168 extended strict liability for a defective product to retailers because they "are an integral part of the overall producing and marketing enterprise that should bear the cost of injuries...." (Id. at p. 262, 37 Cal.Rptr. 896, 391 P.2d 168, italics added.) Additional public policies motivating the creation of the strict products liability theory are "(1) to provide a `short cut' to liability where negligence may be present but is difficult to prove; (2) to provide an economic incentive for improved product safety; (3) to induce the reallocation of resources toward safer products; and (4) to spread the risk of loss among all who use the product." (Pierce v. Pacific Gas & Electric Co. (1985) 166 Cal.App.3d 68, 83, 212 Cal.Rptr. 283, citing, among others, Cronin v. J.B.E. Olson Corp. (1972) 8 Cal.3d 121, 133, 104 Cal.Rptr. 433, 501 P.2d 1153 & Escola v. Coca-Cola Bottling Co., supra, 24 Cal.2d at pp. 461-462, 150 P.2d 436; accord, Barrett v. Superior Court (1990) 222 Cal.App.3d 1176, 1186, 272 Cal.Rptr. 304; Vandermark v. Ford Motor Co., supra, 61 Cal.2d at pp. 262-263, 37 Cal.Rptr. 896, 391 P.2d 168.)
Under the doctrine of strict products liability, the liability of all defendants in the chain of distribution "is joint and several." (Kaminski v. Western MacArthur Co. (1985) 175 Cal.App.3d 445, 455-456, 220 Cal.Rptr. 895; Wimberly, supra, 56 Cal.App.4th at p. 628, 65 Cal.Rptr.2d 532.) Accordingly, each of those defendants can be held liable to the plaintiff for all damages caused by a defective product reduced only by the plaintiffs comparative fault. (Daly v. General Motors Corp. (1978) 20 Cal.3d 725, 736-737, 144 Cal. Rptr. 380, 575 P.2d 1162.)

b. Proposition 51

"California's system of `comparative fault' seeks to distribute tort damages proportionately among all who caused the harm. However, even after judicial adoption of the comparative fault system, every culpable tort defendant, regardless of his or her degree of fault, remained `jointly and severally' liable to pay any damages attributable to the fault of others who failed to contribute their proportionate share. This rule of joint and several liability applied not only to the injured person's 'economic' damages, such as medical costs and lost earnings, but to `non-economic' damages like emotional distress, pain, and suffering." (DaFonte v. Up-Right, Inc. (1992) 2 Cal.4th 593, 595, 7 Cal.Rptr.2d 238, 828 P.2d 140.)
In 1986, the voters of California passed Proposition 51, which modified the system of joint and several liability for damages (DaFonte v. Up-Right, Inc., supra, 2 Cal.4th at pp. 598-600, 7 Cal.Rptr.2d 238, 828 P.2d 140) as set forth in American Motorcycle Assn. v. Superior Court (1978) 20 Cal.3d 578, at pages 586-587, 146 Cal. Rptr. 182, 578 P.2d 899. As noted, the initiative amended Civil Code section 1431 *36 and added sections 1431.1 through 1431.5. Section 1431.1 states that as the result of joint and several liability, defendants who are perceived to have "deep pockets" or insurance coverage were included in litigation "even though there was little or no basis for finding them at fault," and that defendants were held liable for all the damage when they were found to share only "a fraction of the fault." (§ 1431.1, subd. (b).) Civil Code section 1431.1 decries the "inequity and injustice" of such a system and states that it has threatened local governments, public agencies, private individuals, and businesses with financial ruin. (§ 1431.1, subd. (a).) It states, "to remedy these inequities, defendants in tort actions shall be held financially liable in closer proportion to their degree of fault. To treat them differently is unfair and inequitable." (§ 1431.1, subd. (c).)
Civil Code section 1431.2, subdivision (a) states: "In any action for personal injury, property damage, or wrongful death, based upon principles of comparative fault, the liability of each defendant for non-economic damages shall be several only and shall not be joint. Each defendant shall be liable only for the amount of non-economic damages allocated to that defendant in direct proportion to that defendant's percentage of fault, and a separate judgment shall be rendered against that defendant for that amount." Thus, in an action subject to Proposition 51, each tortfeasor remains jointly and severally liable to the plaintiff for economic damages, but is liable to the plaintiff for only its proportionate share of noneconomic damages. (DaFonte v. Up-Right, Inc., supra, 2 Cal.4th at p. 600, 7 Cal.Rptr.2d 238, 828 P.2d 140.)

c. Wimberly

In Wimberly, the plaintiff suffered injuries when the fork assembly on his bicycle broke. He brought a strict products liability action against the designer, manufacturer, and seller of the fork assembly, among others. After settling with a number of the defendants before trial, the plaintiff proceeded at trial against the producer-distributor defendant only. (Wimberly, supra, 56 Cal.App.4th at pp. 623-624, 65 Cal.Rptr.2d 532.) After the jury returned a verdict against it, the defendant appealed contending the trial court erred in refusing to apply Proposition 51 to require the jury to apportion "fault" among it and the other defendants in the chain of distribution. (Id. at p. 623, 65 Cal.Rptr.2d 532.) Wimberly rejected this contention.
Wimberly held that Proposition 51 did not modify the common law rule that defendants in an action for strict products liability who are in the chain of distribution of the same defective product are jointly and severally liable for all of the plaintiffs economic and noneconomic damages. (Wimberly, supra, 56 Cal.App.4th at p. 633, 65 Cal.Rptr.2d 532.) In reaching its conclusion, Wimberly relied on three opinions by this court holding that Proposition 51 does not relieve defendants whose liability was solely vicarious of all liability for noneconomic damages. (Id. at pp. 629-630, 65 Cal.Rptr.2d 532.) We held in those cases that if a defendant's liability is based entirely on a rule of law that imposes liability without fault and is not based on the defendant's independent conduct, the defendant is liable to the plaintiff for noneconomic damages in the same amount as the person whose liability is imputed to the defendant. (Srithong v. Total Investment Co. (1994) 23 Cal.App.4th 721, 728, 28 Cal. Rptr.2d 672 [Proposition 51 does not apply where liability imposed vicariously by virtue of defendants' status as lessors under nondelegable duty doctrine]; Rashtian v. BRAC-BH, Inc. (1992) 9 Cal.App.4th 1847, *37 1853-1854, 12 Cal.Rptr.2d 411 [Proposition 51 does not apply where liability imposed on defendant vicariously by permissive user statutes as matter of public policy]; Miller v. Stouffer (1992) 9 Cal.App.4th 70, 84,11 Cal.Rptr.2d 454 [Proposition 51 does not apply where liability imposed on defendant vicariously via doctrine of respondeat superior].) In reaching our conclusion, we noted that application of Proposition 51 "necessarily requires independently acting tortfeasors who have some fault to compare." (Rashtian, supra, at p. 1851, 12 Cal.Rptr.2d 411.) However, we reasoned, "vicarious liability is a departure from the general tort principle that liability is based on fault [citation]" (Srithong, supra, at p. 726, 28 Cal.Rptr.2d 672), where for "deliberate reasons of public policy, a defendant who is without fault is subject to vicarious liability for the negligence of another." (Miller, supra, at p. 85, 11 Cal.Rptr.2d 454.) We concluded that the voters intended Proposition 51 to require apportionment of liability among persons at fault, but did not intend the measure to eliminate vicarious liability for noneconomic damages. (Rashtian, supra, at p. 1854, 12 Cal.Rptr.2d 411; Miller, supra, at pp. 84-85, 11 Cal.Rptr.2d 454; see Srithong, supra, at p. 728, 28 Cal.Rptr.2d 672.)
Strict products liability is similar to vicarious liability, Wimberly determined, because under both theories, liability is imposed on the defendant to serve analogous public policies. (Wimberly, supra, 56 Cal. App.4th at p. 630, 65 Cal.Rptr.2d 532.) Wimberly quoted at length from our Supreme Court: "While strict product liability is not commonly referred to as `vicarious liability,' in Far West Financial Corp. v. D. & S. Co. (1988) 46 Cal.3d 796, 813, footnote 13, 251 Cal.Rptr. 202, 760 P.2d 399, the court noted the concepts' similarities: 'In many instancesfor example, strict product liabilitytort law places "direct" liability on an individual or entity which may have exercised due care in order to serve the public policies of a fair allocation of the costs of accidents or to encourage even greater safety efforts than are imposed by the due care standard. (See, e.g., Greenman v. Yuba Power Products, Inc., [supra,] 59 Cal.2d 57, 63, 27 Cal.Rptr. 697, 377 P.2d 897....) As a leading text on torts explains, the modern justification for vicarious liability closely parallels the justification for imposing liability on the nonnegligent manufacturer of a product: "What has emerged as the modern justification for vicarious liability is a rule of policy, a deliberate allocation of risk. The losses caused by the torts of employees, which as a practical matter are sure to occur in the conduct of the employer's enterprise, are placed upon that enterprise itself, as a required cost of doing business. They are placed upon the employer because, having engaged in an enterprise, which will on the basis of all past experience involve harm to others through the torts of employees, and sought to profit by it, it is just that he, rather than the innocent plaintiff, should bear them; and because he is better able to absorb them, and to distribute them, through prices, rates or liability insurance, to the public, and so to shift them to society, to the community at large." [Citation.]' " (Wimberly, supra, at p. 630, 65 Cal.Rptr.2d 532, italics added by Wimberly; compare Mary M. v. City of Los Angeles (1991) 54 Cal.3d 202, 209, 285 Cal.Rptr. 99, 814 P.2d 1341 [among policies behind respondeat superior doctrine is to "ensure that the victim's losses will be equitably borne by those who benefit from the enterprise that gave rise to the injury"]; see Barry v. Raskov (1991) 232 Cal.App.3d 447, 455, 283 Cal.Rptr. 463 ["The law has long recognized one party may owe a duty to another which, for public policy reasons, cannot be delegated."].) As with vicarious *38 liability, strict product liability is motivated by the deliberate public policy decisions to hold a defendant liable by virtue of the defendant's status, rather than its conduct. Because strict product liability is similar to vicarious liability in that, under either doctrine, a defendant can be held liable regardless of whether the defendant was negligent, Wimberly concluded that "the reasoning of Miller, Rashtian and Srithong applies equally here." (Wimberly, supra, at p. 630, 65 Cal.Rptr.2d 532.)
Wimberly explained why Proposition 51 should not apply to strict products liability cases. To limit a defendant's responsibility in strict products liability for noneconomic damages to a proportionate share based on fault would undermine the purpose of strict products liability: "[T]he potential reduction or elimination of a plaintiffs recovery for noneconomic damages through apportionment of `fault' would reallocate the risks accompanying use of defective products and utterly defeat the principal policy reasons for the adoption of strict product liability." (Wimberly, supra, 56 Cal.App.4th at p. 632, 65 Cal.Rptr.2d 532.) "To any extent the concept of `fault' applies, it is only '"equated with the responsibility for placing a defective product into the stream of commerce...."' [Citation.]" (Ibid., quoting Barrett v. Superior Court, supra, 222 Cal.App.3d at p. 1189, 272 Cal.Rptr. 304.) "Further, potentially reducing or eliminating the defendant's responsibility for noneconomic damages would thwart the public policy of insuring' the costs of injuries caused by defective products are borne by those putting them on the market, `rather than by the injured persons who are powerless to protect themselves.' (Greenman v. Yuba Power Products, Inc., supra, 59 Cal.2d at p. 63, 27 Cal.Rptr. 697, 377 P.2d 897.) Responsibility is to be fixed "wherever it will most effectively reduce the hazards to life and health inherent in defective products that reach the market.' (Escola v. Coca Cola Bottling Co., supra, 24 Cal.2d at p. 462, 150 P.2d 436.) Potentially leaving the plaintiff with little or no recovery for pain and suffering and other noneconomic damages disserves this purpose. ... [¶] In sum, the retention of `joint and several liability' of parties in a defective product's chain of distribution for the plaintiffs full damages without a showing of negligence is essential to the theory of strict product liability." (Wimberly, supra, at pp. 632-633, 65 Cal.Rptr.2d 532.)
Wimberly stated: "Accordingly, we hold Proposition 51 has no application in a strict product liability case where, as here, the plaintiffs injuries are caused solely by a defective product. A strictly liable defendant cannot reduce or eliminate its responsibility to the plaintiff for all injuries caused by a defective product by shifting blame to other parties in the product's chain of distribution who are ostensibly more at `fault,' and therefore may be negligent as well as strictly liable. The defendant's recourse, if not precluded by good faith settlement principles, lies in an indemnity action. [Citations.] [Fn. omitted.]" (Wimberly, supra, 56 Cal.App.4th at p. 633, 65 Cal.Rptr.2d 532; accord, Springmeyer v. Ford Motor Co. (1998) 60 Cal. App.4th 1541, 1575-1576, 71 Cal.Rptr.2d 190.)

d. Proposition 51 Does Not Apply in This Strict Products Liability Action Involving a Single Defective Product Where All Defendants Are in the Same Chain of Distribution

This case is no different from Wimberly, which is well-reasoned and, along with the cases upon which it relies, persuasive. Bostick's injuries were caused by a single defective product. Flex was found liable under the strict products liability *39 theory.[7] The doctrine of strict products liability attaches without regard to fault as a matter of social policy. Thus, Proposition 51, which by its terms applies to actions "based upon principles of comparative fault" (Civ.Code, § 1431.2, subd. (a)), is not triggered by facts of this case. To apportion the noneconomic damages under Proposition 51 would be to reduce or potentially eliminate a plaintiffs recovery of noneconomic damages, which are often far greater than the economic damages, thereby reallocating the risks and losses associated with the use of defective products and utterly defeating the principal social justifications for the adoption of strict products liability. (Wimberly, supra, 56 Cal. App.4th at p. 632, 65 Cal.Rptr.2d 532.)
Some have observed that liability for noneconomic damages can be apportioned because strict products liability is not liability without fault. (See, Daly v. General Motors Corp., supra, 20 Cal.3d at p. 739, 144 Cal.Rptr. 380, 575 P.2d 1162; Wilson v. John Crane, Inc. (2000) 81 Cal.App.4th 847, 853, 97 Cal.Rptr.2d 240.) Yet, as Wimberly explained, the only "fault" relevant in strict products liability cases, if any, is the defendant's participation in the chain of distribution of a defective product. (Wimberly, supra, 56 Cal.App.4th at p. 632, 65 Cal.Rptr.2d 532; see also, Barrett v. Superior Court, supra, 222 Cal.App.3d at p. 1189, 272 Cal.Rptr. 304.) That is, liability under the strict products liability doctrinejust as with vicarious liability is imposed on a defendant irrespective of negligence, as a matter of social policy, not because of independent and culpable conduct. It is imposed on defendants because of their status as a member of the chain of distribution. (Wimberly, supra, at pp. 630, 632-633, 65 Cal.Rptr.2d 532, quoting from Greenman, supra, 59 Cal.2d at p. 63, 27 Cal.Rptr. 697, 377 P.2d 897; accord Malone, Contrasting Images of Torts, supra, 13 Stan. L.Rev., at p. 804; Pierce v. Pacific Gas & Electric Co., supra, 166 Cal.App.3d at p. 83, 212 Cal.Rptr. 283.) Defendants in strict products liability cases are not joint tortfeasors in the traditional sense. Their liability attaches regardless of the extent of their participation in the conduct that caused the plaintiffs injuries. These defendants are not independent tortfeasors, but are held responsible by reason of liability imposed by a rule of law born of public policy. (See, e.g., Rashtian v. BRAC-BH, Inc., supra, 9 Cal. App.4th at p. 1852, 12 Cal.Rptr.2d 411.) Thus, the defendants within the chain of distribution of a defective product are viewed "`as a single entity.'" (Kesmodel v. Rand (2004) 119 Cal.App.4th 1128, 1142-1143, 15 Cal.Rptr.3d 118.) By its terms, Proposition 51 is not triggered in a case of strict products liability where there is one defective product and all of the defendants are in the same chain of distribution. The reason is that in strict products liability cases, there is no fault to compare. All defendants are liable for the same conduct. (Ibid)
Indeed, applying concepts of "fault" in a strict products liability case would defeat the very purposes of the doctrine because it would re-impose on the plaintiff the burden of proving negligencean obligation that the doctrine was designed to eliminate. (Daly v. General Motors Corp., supra, 20 Cal.3d at p. 736, 144 Cal.Rptr. 380, 575 P.2d 1162; Wimberly, supra, 56 Cal. App.4th at p. 632, 65 Cal.Rptr.2d 532; *40 Pierce v. Pacific Gas & Electric Co., supra, 166 Cal.App.3d at p. 83, 212 Cal.Rptr. 283.) Application of Proposition 51 to abolish joint liability for noneconomic damages based on fault would also allow defendants to escape liability for such damages while avoiding the risks incident in their enterprise, thereby undermining the goals of spreading the risk throughout society and inducing safety. (Wimberly, supra, at p. 633, 65 Cal.Rptr.2d 532.) Effectively, to hold, as the concurring opinion urges, that Proposition 51 eliminates liability for noneconomic damages for all defendants beyond that attributable to their fault would abrogate the doctrine of strict products liability imposed strictly based on status and irrespective of fault.
Neither Daly v. General Motors Corp., supra, 20 Cal.3d 725, 144 Cal.Rptr. 380, 575 P.2d 1162 nor Safeway Stores, Inc. v. Nest-Kart (1978) 21 Cal.3d 322, 146 Cal. Rptr. 550, 579 P.2d 441, changes our conclusion. Daly held that in an action for strict products liability, the plaintiffs recovery could be reduced in proportion to the plaintiffs comparative fault. (Daly, supra, at pp. 736-737, 144 Cal.Rptr. 380, 575 P.2d 1162.) As Wimberly explained, even where the plaintiffs comparative fault is factored in, the plaintiff is still not required to prove that the manufacturer or the distributor was negligent in the production, design, or selling of the defective product. "`Defendant's liability for injuries caused by a defective product remains strict.'" (Wimberly, supra, 56 Cal. App.4th at p. 631, 65 Cal.Rptr.2d 532, quoting from Daly, supra, at pp. 736-737, 144 Cal.Rptr. 380, 575 P.2d 1162, italics added by Wimberly.) Nor were the other principles justifying the doctrine of strict products liability undermined by the Daly rule. The defendant manufacturer continues to be responsible for the costs of compensating the victim injured by the defective producteven if the damages are proportionately reducedand the incentives to making safer products remain intact. (Wimberly, supra, at p. 631, 65 Cal. Rptr.2d 532.)[8]
Safeway held that comparative fault principles provided the bases for apportionment of liability between defendants, one of whose liability to the plaintiff was based on strict products liability and the other of whose liability was largely premised on negligence. (Safeway Stores, Inc. v. Nest-Kart, supra, 21 Cal.3d at p. 330, 146 Cal.Rptr. 550, 579 P.2d 441.) A case involving equitable indemnity, Safeway does not alter our conclusion. Safeway *41 explained, "Nothing in the rationale of strict products liability conflicts with a rule which apportions liability between a strictly liable defendant and other responsible tortfeasors." (Ibid.) The court there also observed, "In the instant case the jury found that Safeway was itself negligent in failing to safely maintain its carts, and thus Safeway's liability is in no sense solely derivative or vicarious. Accordingly, we have no occasion to determine in this case whether the comparative indemnity doctrine should be applied in a situation in which a party's liability is entirely derivative or vicarious in nature. [Citations.]" (Id. at p. 332, fn. 5, 146 Cal.Rptr. 550, 579 P.2d 441, italics added.) Just as Safeway was not applicable to Wimberly, it is inapplicable here where the "plaintiffs injuries were caused solely by a defective product and the only parties among whom `fault' can be apportioned under Proposition 51 are in its chain of distribution." (Wimberly, supra, 56 Cal.App.4th at p. 632, 65 Cal.Rptr.2d 532.)[9]
In sum, following Wimberly, supra, 56 Cal.App.4th 618, 65 Cal.Rptr.2d 532, we hold that in a strict products liability action involving a single defective product where all of the defendants are in the same chain of distribution, Proposition 51 does not eliminate the liable defendant's joint responsibility for noneconomic damages because that defendant's liability is not based on fault but rather is imposed by a rule of law as a matter of public policy.
In light of this conclusion, we need not reach Bostick's contention that because Proposition 51 applies to this case, the setoff required by Code of Civil Procedure 877 for a good faith settlement should be limited to that portion of the settlement attributable to economic damages only. Nonetheless, we are constrained to observe that the consequence of disagreeing with Wimberly and applying Proposition 51 to this case is that the concurring opinion necessarily must address and disregard the longstanding and widely accepted precedent for allocating setoffs under Proposition 51 and Code of Civil Procedure section 877. The doctrine of stare decisis presents a "formidable obstacle" to the reconsideration of law relied on for 15 years. (People v. Garcia (2006) 39 Cal.4th 1070, 1080, 48 Cal.Rptr.3d 75, 141 P.3d 197.) "`It is, of course, a fundamental jurisprudential policy that prior applicable precedent usually must be followed even though the case, if considered anew, might be decided differently by the current justices. This policy, known as the doctrine of stare decisis, "is based on the assumption that certainty, predictability and stability in the law are the major objectives of the legal system; i.e., that parties should be able to regulate their conduct and enter into relationships with reasonable assurance of the governing rules of law."' [Citations.]" (Ibid.) The change in the law of Proposition 51 compels an unnecessary reconsideration of long honored precedent with respect to the allocation of setoffs *42 under section 877. We conclude that the computation should not be changed.

3. The Jury's Apportionment of Fault Between Flex and "Other Entities" Is Not Collateral Estoppel Against Flex in Gold's Gym's Cross-Action

a. Principles of Collateral Estoppel

The court entered a judgment on the pleadings awarding Gold's Gym total equitable indemnity on its cross-complaint against Flex based on the jury's finding that the percentage of fault attributable to "other entities" was zero. The ruling was based on the doctrine of collateral estoppel.
Collateral estoppel or issue preclusion bars the relitigation of an issue that was previously adjudicated if (1) the issue is identical to an issue decided in a prior proceeding; (2) the issue was actually litigated; (3) the issue was necessarily decided; (4) the decision in the prior proceeding is final and on the merits; and (5) the party against whom collateral estoppel is asserted was a party to the prior proceeding or in privity with a party to the prior proceeding. (Lucido v. Superior Court (1990) 51 Cal.3d 335, 341, 272 Cal. Rptr. 767, 795 P.2d 1223.) "The `identical issue' requirement addresses whether 'identical factual allegations' are at stake in the two proceedings, not whether the ultimate issues or dispositions are the same. [Citation.]" (Id. at p. 342, 272 Cal.Rptr. 767, 795 P.2d 1223.) The "necessarily decided" requirement means only that the resolution of the issue cannot have been "`entirely unnecessary' to the judgment in the prior proceeding." (Ibid.)
The purposes of collateral estoppel are to prevent inconsistent judgments that undermine the integrity of the judicial system, promote judicial economy by minimizing repetitive litigation, and protect litigants from harassment by vexatious litigation. (Vandenberg v. Superior Court (1999) 21 Cal.4th 815, 829, 88 Cal. Rptr.2d 366, 982 P.2d 229; People v. Taylor (1974) 12 Cal.3d 686, 695, 117 Cal.Rptr. 70, 527 P.2d 622, disapproved on another point in People v. Palmer (2001) 24 Cal.4th 856, 867, 103 Cal.Rptr.2d 13, 15 P.3d 234.) Collateral estoppel is not an inflexible doctrine. Even if the minimal requirements for its application are satisfied, the doctrine should not be applied if considerations of policy or fairness outweigh the doctrine's purposes as applied in a particular case. (Vandenberg, supra, at p. 829, 88 Cal.Rptr.2d 366, 982 P.2d 229; Taylor, supra, at p. 695,117 Cal.Rptr. 70, 527 P.2d 622.) "In deciding whether the doctrine is applicable in a particular situation a court must balance the need to limit litigation against the right of a fair adversary proceeding in which a party may fully present his case. [Citation.]" (Taylor, supra, at p. 695, 117 Cal.Rptr. 70, 527 P.2d 622.) "Moreover, a particular, danger of injustice arises when collateral estoppel is invoked by a nonparty to the prior litigation. [Citations.] Such cases require close examination to determine whether nonmutual use of the doctrine is fair and appropriate. [Citations.]" (Vandenberg, supra, at pp. 829-830, 88 Cal.Rptr.2d 366, 982 P.2d 229.)
California courts recognize exceptions to the general rule of collateral estoppel. One such exception is where the party to be precluded, or person in privity with that party, had inadequate incentive to fully litigate the issue in the prior proceeding. (Sutton v. Golden Gate Bridge, Highway & Transportation Dist. (1998) 68 Cal.App.4th 1149, 1155-1157, 81 Cal. Rptr.2d 155; see Long Beach Grand Prix Assn. v. Hunt (1994) 25 Cal.App.4th 1195, 1202-1203, 31 Cal.Rptr.2d 70.)
Moreover, collateral estoppel applies between parties who were codefendants *43 in a prior proceeding only as to issues they litigated fully and fairly as adversaries to each other. (Sutton v. Golden Gate Bridge, Highway & Transportation Dist, supra, 68 Cal.App.4th at pp. 1155-1157, 81 Cal.Rptr.2d 155; Long Beach Grand Prix Assn. v. Hunt, supra, 25 Cal.App.4th at p. 1203, 31 Cal.Rptr.2d 70; see Rest.2d Judgments, § 38, p. 378.) "Parties who are not adversaries to each other under the pleadings in an action involving them and a third party are bound by and entitled to the benefits of issue preclusion with respect to issues they actually litigate fully and fairly as adversaries to each other and which are essential to the judgment rendered." (Rest.2d Judgments, § 38, p. 378.)

b. Flex Had No Meaningful Incentive to Adjudicate the Issue of Gold's Gym's Comparative Fault in the Action on the Complaint and the Issue Was Not Fully and Fairly Litigated

As discussed, Flex and Gold's Gym were named as codefendants in the complaint. For trial, their cross-complaints against each other were severed from the complaint. Bostick presented evidence at trial on the complaint to support his claims that Gold's Gym negligently failed to warn him of dangers presented by ordinary use of the Smith machine and that Gold's Gym, as a participant in the chain of distribution, was jointly and severally liable for a product defect. The court denied Gold's Gym's motion for nonsuit or directed verdict as to the causes of action for negligence and strict liability, and granted a nonsuit only on the claim of breach of warranty. After all parties had rested, Gold's Gym agreed to pay Bostick $7.3 million in settlement and was dismissed from the action on the complaint before closing arguments. Because Gold's Gym is not a party to the judgment on the complaint, the assertion of collateral estoppel by Gold's Gym requires a close examination to determine whether use of the doctrine is fair and appropriate. (Vandenberg v. Superior Court, supra, 21 Cal.4th at pp. 829-830, 88 Cal.Rptr.2d 366, 982 P.2d 229.)
As explained in section 2, ante, the rule is that those in the same chain of distribution of a defective product are jointly and severally liable to an injured plaintiff for all compensable economic and noneconomic damages caused by the defective product, notwithstanding Proposition 51. (Wimberly, supra, 56 Cal.App.4th at p. 633, 65 Cal.Rptr.2d 532.) Under that rule of law, Flex's liability to Bostick is not reduced by the comparative fault of Gold's Gym. Instead, Flex is liable to Bostick for all economic and noneconomic damages suffered, reduced only in proportion to Bostick's comparative fault (Daly v. General Motors Corp., supra, 20 Cal.3d at pp. 736-737, 144 Cal.Rptr. 380, 575 P.2d 1162). For this reason, even before Gold's Gym was dismissed as a defendant, Flex had no meaningful incentive for purposes of the action on the complaint to adjudicate the issue of Gold's Gym's comparative fault.
Moreover, Gold's Gym's potential liability for a product defect or failure to warn under the strict products liability doctrine also inculpated Flex as a participant in the same chain of distribution. Any effort by Flex to establish Gold's Gym's liability on those theories undermined Flex's own defense and provided no discernible benefit for Flex.
Our review of the record shows that Flex and Gold's Gym did not, in fact, fully and fairly litigate the issue of Gold's Gym's comparative fault. Flex apparently heeded the risks inherent in inculpating a codefendant and did not treat Gold's Gym as an adversary at trial. Flex's counsel in closing argument referred to Gold's Gym only *44 in passing and did not attempt to shift responsibility to Gold's Gym. Moreover, apart from Flex's failure to fully litigate the issue, by the time of closing arguments Bostick also had no reason to establish Gold's Gym's responsibility for his injury and did not attempt to do so. Bostick had settled with Gold's Gym, wished to maximize his recovery against Flex, and no longer had reason to show that Gold's Gym was at fault. The lack of a full and fair litigation of the issue of the comparative fault of Gold's Gym precludes the application of collateral estoppel.
We therefore hold that the jury's finding that the percentage of fault attributable to "other entities" was zero cannot be binding upon Flex as a cross-defendant and therefore conclude that the judgment awarding total equitable indemnity in favor of Gold's Gym and against Flex based on collateral estoppel was error. In light of that conclusion, we need not address the other grounds asserted by Flex for challenging the judgment on Gold's Gym's cross-complaint.

CONCLUSION
We conclude that the judgment on Bostick's complaint must be affirmed. We also conclude that the judgment on Gold's Gym's cross-complaint against Flex must be reversed and the matter remanded for further proceedings to determine the amount of any equitable indemnity that Gold's Gym may recover from Flex. Because of our holding, we need not reach the additional contentions on appeal concerning the setoff required by section 877 and equitable indemnity.

DISPOSITION
The judgment on the complaint is affirmed (case No. B171567). The judgment on the cross-complaint is reversed, and the matter is remanded for further proceedings consistent with the views expressed herein (case No. B173455). Each party is to bear its own costs on appeal.
I CONCUR: KITCHING, J.
CROSKEY, Acting P.J., Concurring.
I concur in the decision affirming the judgment on the complaint, but for reasons different from those stated in the majority opinion. In my view, Proposition 51 applies to a strict products liability action involving a single indivisible injury, and Wimberly v. Derby Cycle Corp. (1997) 56 Cal.App.4th 618, 65 Cal.Rptr.2d 532 (Wimberly) was wrongly decided. Wimberly held that Proposition 51 did not modify the common law rule that defendants in an action for strict products liability who were in the same chain of distribution of a defective product are jointly and severally liable for all of the plaintiffs economic and noneconomic damages. Wimberly, improperly in my view, relied on the rationale that strict products liability is similar to vicarious liability in that it is not based on "fault," and therefore concluded that Proposition 51 did not apply. Wimberly also concluded that the public policy considerations underlying strict products liability favor complete joint and several liability among all defendants. In my view, neither of these reasons can justify the failure to apply the statutory mandate of Proposition 51 in a strict products liability action.
I conclude further that despite the application of Proposition 51, the setoff required by Code of Civil Procedure section 877 (section 877) for a good faith settlement applies to both economic and noneconomic damages, contrary to Espinoza v. Machonga (1992) 9 Cal.App.4th 268, 11 Cal.Rptr.2d 498 (Espinoza), Hoch v. Allied-Signal, Inc. (1994) 24 Cal.App.4th 48, 29 Cal.Rptr.2d 615 (Hoch), and their progeny. *45 In my view, both the language of section 877 and the purposes of the statute compel the conclusion that section 877 requires a setoff of the noneconomic portion of a good faith settlement to the extent necessary to avoid a double recovery by the plaintiff. I suggest a formula to reduce the plaintiffs claims against nonsettling defendants in accordance with section 877 and determine the amounts of economic and noneconomic damages to award the plaintiff in an action subject to Proposition 51. Applying that formula in this case, I conclude that the reduction of the amount of the judgment against Flex Equipment Company, Inc. (Flex) by the full amount of the $7.3 million settlement between the plaintiff Harold L. Bostick (Bostick) and Gold's Gym, Inc. (Gold's Gym) was proper.
Finally, I concur in that part of the majority opinion reversing the judgment on the cross-complaint by Gold's Gym due to the absence of collateral estoppel.[1] In light of my conclusion that Proposition 51 applies, however, I find it necessary to address and reject Flex's contention that Gold's Gym is entitled to equitable indemnity for only the portion of the settlement that represents payment for economic damages. The purpose of equitable indemnity is to avoid unjust enrichment, and a nonsettling defendant whose liability for noneconomic damages is reduced due to the plaintiffs good faith settlement with a joint tortfeasor is unjustly enriched unless the nonsettling defendant is made to indemnify the settling tortfeasor in the amount of the reduction.
Bostick challenges the amount of the setoff to which Flex is entitled by reason of his settlement with Gold's Gym. He contends the setoff should be limited to the portion of the settlement representing payment for economic damages, based on Proposition 51. I agree with Bostick that Proposition 51 applies, but conclude that section 877 requires a setoff of the full amount of the $7.3 million settlement, including the portion of the settlement representing payment for noneconomic damages. Flex challenges the award of total equitable indemnity in favor of Gold's Gym on the cross-complaint. Flex contends if Proposition 51 applies, Gold's Gym is entitled to equitable indemnity for only for the portion of its settlement representing payment for economic damages. I disagree with Flex and conclude that if Gold's Gym on remand establishes a right of equitable indemnity, the recovery should encompass not only the portion of the settlement attributable to economic damages, but also the portion of the settlement attributable to noneconomic damages.

1. A Defendant in a Strict Products Liability Action Is Liable to the Plaintiff for Only Its Proportionate Share of Noneconomic Damages

a. Strict Products Liability and Comparative Fault Principles

The doctrine of strict products liability imposes strict liability in tort on the manufacturer of a defective product and others in the product's chain of distribution. (Jimenez v. Superior Court (2002) 29 Cal.4th 473, 477-78, 127 Cal.Rptr.2d 614, 58 P.3d 450; Greenman v. Yuba Power Products, Inc. (1963) 59 Cal.2d 57, 63, 27 Cal.Rptr. 697, 377 P.2d 897.) The purpose of the imposition of liability is to ensure that the loss is borne not by injured consumers but by manufacturers, retailers, and others in the chain of distribution who are better able to bear the risks and costs *46 of injury, and to serve as an incentive to safety. (Jimenez, supra, at pp. 477-478, 127 Cal.Rptr.2d 614, 58 P.3d 450; Anderson v. Owens-Corning Fiberglas Corp. (1991) 53 Cal.3d 987, 1003, 281 Cal. Rptr. 528, 810 P.2d 549; Vandermark v. Ford Motor Co. (1964) 61 Cal.2d 256, 262-263, 37 Cal.Rptr. 896, 391 P.2d 168.) Under the doctrine developed by the courts, persons in a product's chain of distribution were jointly and severally liable to the plaintiff for all compensable damages caused by a defective product regardless of the degree of their comparative fault (Wimberly, supra, 56 Cal.App.4th at p. 628, 65 Cal.Rptr.2d 532), so each of those persons could be held liable to the plaintiff for all damages caused by a defective product diminished only by the plaintiffs comparative fault. (Daly v. General Motors Corp. (1978) 20 Cal.3d 725, 736-737, 144 Cal.Rptr. 380, 575 P.2d 1162 (Daly).). Each person so held liable retains the right to recover equitable indemnity from other concurrent tortfeasors based on comparative fault. (Expressions at Rancho Niguel Assn. v. Ahmanson Developments, Inc. (2001) 86 Cal.App.4th 1135, 1140-1143,103 Cal.Rptr.2d 895.)
Daly, supra, 20 Cal.3d at page 730, 144 Cal.Rptr. 380, 575 P.2d 1162, held that the principles of comparative fault expressed in Li v. Yellow Cab Co. (1975) 13 Cal.3d 804, 119 Cal.Rptr. 858, 532 P.2d 1226 applied to an action for strict products liability. Li abrogated the contributory negligence doctrine, which barred recovery if the plaintiffs conduct contributed as a legal cause of injury in any degree, and adopted the comparative negligence doctrine, which reduces the plaintiffs recovery only in proportion to the plaintiffs comparative fault. (Id. at pp. 828-829, 119 Cal.Rptr. 858, 532 P.2d 1226.) Daly held specifically that In an action for strict products liability, the plaintiffs recovery should be reduced in proportion to the plaintiffs comparative fault. (Daly, supra, at pp. 736-737, 144 Cal.Rptr. 380, 575 P.2d 1162.) Daly stated that such an apportionment reflected more accurately an "`equitable apportionment or allocation of loss'" rather than a comparison of fault, but nonetheless adopted the term "comparative fault" in this context due to its common use. (Id. at pp. 736, 742, 144 Cal.Rptr. 380, 575 P.2d 1162.) Daly rejected the argument that jurors cannot measure or compare a plaintiffs negligence with a defendant's strict liability, stating, "We are unpersuaded by the argument and are convinced that jurors are able to undertake a fair apportionment of liability." (Id. at p. 738, 144 Cal.Rptr. 380, 575 P.2d 1162.) Daly also rejected the argument that jurors cannot fairly apportion loss to entities in the chain of distribution other than the manufacturer, stating: "Regardless of the identity of a particular defendant or of his position in the commercial chain the basis for his liability remains that he has marketed or distributed a defective product. If, as we believe, jurors are capable of assessing fully and fairly the legal responsibility of a manufacturer on a strict liability basis, no reason appears why they cannot do likewise with respect to subsequent distributors and vendors of the product." (Id. at p. 739, 144 Cal.Rptr. 380, 575 P.2d 1162.)
Daly concluded, "Having examined the principal objections and finding them not insurmountable, and persuaded by logic, justice, and fundamental fairness, we conclude that a system of comparative fault should be and it is hereby extended to actions founded on strict products liability." (Daly, supra, 20 Cal.3d at p. 742, 144 Cal.Rptr. 380, 575 P.2d 1162.) Daly stated further: "We reiterate that our reason for extending a full system of comparative fault to strict products liability is because it is fair to do so. The law consistently *47 seeks to elevate justice and equity above the exact contours of a mathematical equation. We are convinced that in merging the two principles what may be lost in symmetry is more than gained in fundamental fairness." (Ibid.)
Safeway Stores, Inc. v. Nestr-Kart (1978) 21 Cal.3d 322, 328-332, 146 Cal.Rptr. 550, 579 P.2d 441 (Safeway) held that in a cross-action for equitable indemnity, comparative fault principles provided the basis for apportionment of liability between a defendant whose liability to the plaintiff was based on strict products liability and a defendant whose liability was based on both strict liability and negligence. The court stated, "even in cases in which one or more tortfeasors' liability rests on the principle of strict liability, fairness and other tort policies, such as deterrence of dangerous conduct or encouragement of accident-reducing behavior, frequently call for an apportionment of liability among multiple tortfeasors." (Id. at p. 330, 146 Cal.Rptr. 550, 579 P.2d 441.) The court stated further, "Nothing in the rationale of strict product liability conflicts with a rule which apportions liability between a strictly liable defendant and other responsible tortfeasors." (Ibid.) Safeway rejected the argument that there was no logical basis to apportion responsibility between strictly liable and negligent defendants, stating, "As our recent decision in Daly explains ..., the suggested difficulties are more theoretical than practical, and experience in other jurisdictions demonstrates that juries are fully competent to apply comparative fault principles between negligent and strictly liable defendants. [Citations.]" (Id. at p. 331, 146 Cal.Rptr. 550, 579 P.2d 441.) Safeway noted that the jury in the case then before the court had apportioned fault between the owner of the shopping cart, found by the jury to be both negligent and strictly liable, and the manufacturer, found by the jury to be only strictly liable, and stated, "We see no reason to assume that a similar common sense determination of proportional fault or proportional responsibility will be beyond the ken of other juries in similar cases." (Id. at p. 332, 146 Cal.Rptr. 550, 579 P.2d 441.) The California Supreme Court has stated more recently, "Past California cases have made it clear that the `comparative fault' doctrine is a flexible, commonsense concept, under which a jury properly may consider and evaluate the relative responsibility of various parties for an injury (whether their responsibility for the injury rests on negligence, strict liability, or other theories of responsibility), in order to arrive at an 'equitable apportionment or allocation of loss.' [Citations.]" (Knight v. Jewett (1992) 3 Cal.4th 296, 313-314, 11 Cal. Rptr.2d 2, 834 P.2d 696 (plur. opn. of George, J.).)

b. Proposition 51

The voters of California passed Proposition 51 in 1986. The initiative amended Civil Code section 1431 and added sections 1431.1 through 1431.5. Section 1431.1 states that the doctrine of joint and several liability has resulted in defendants who are perceived to have "deep pockets" or insurance coverage being included in litigation "even though there was little or no basis for finding them at fault," and that defendants have been held liable for all the damage when they were found to share only "a fraction of the fault." (Id., subd. (b).) Civil Code section 1431.1 decries the "inequity and injustice" of such a system and states that it has threatened local governments, public agencies, and private individuals and businesses with financial ruin. (Id., subd. (a).) It states, "to remedy these inequities, defendants in tort actions shall be held financially liable in closer proportion to their degree of fault. To *48 treat them differently is unfair and inequitable." (§ 1481.1, subd. (c).)
Civil Code section 1431.2, subdivision (a) states: "In any action for personal injury, property damage, or wrongful death, based upon principles of comparative fault, the liability of each defendant for noneconomic damages shall be several only and shall not be joint. Each defendant shall be liable only for the amount of noneconomic damages allocated to that defendant in direct proportion to that defendant's percentage of fault, and a separate judgment shall be rendered against that defendant for that amount." Proposition 51 modified the common law rule that multiple tortfeasors responsible for the same indivisible injury generally were jointly and severally liable to the plaintiff for all damages. (DaFonte v. Up-Right, Inc. (1992) 2 Cal.4th 593, 598-600, 7 Cal. Rptr.2d 238, 828 P.2d 140 (DaFonte); American Motorcycle Assn. v. Superior Court (1978) 20 Cal.3d 578, 586-587, 146 Cal.Rptr. 182, 578 P.2d 899 (American Motorcycle).) In an action subject to Proposition 51, each tortfeasor remains jointly and severally liable to the plaintiff for economic damages, but is liable to the plaintiff for only its proportionate share of noneconomic damages. (DaFonte, supra, at p. 600, 7 Cal.Rptr.2d 238, 828 P.2d 140.)

c. Wimberly v. Derby Cycle Corp.

Wimberly, supra, 56 Cal.App.4th at page 633, 65 Cal.Rptr.2d 532 held that Proposition 51 did not modify the common law rule that defendants in an action for strict products liability who were in the same chain of distribution of a defective product are jointly and severally liable for all of the plaintiff's economic and noneconomic damages. Wimberly cited three opinions by this court holding that Proposition 51 did not relieve defendants whose liability was solely vicarious of all liability for noneconomic damages. (Wimberly, supra, at pp. 629-630, 65 Cal.Rptr.2d 532.) We held in those cases that if a defendant's liability is based entirely on a rule of law that imposes liability without fault and is not based on the defendant's independent culpability, the defendant is liable to the plaintiff for noneconomic damages in the same amount as the person whose liability is imputed to the defendant. (Srithong v. Total Investment Co. (1994) 23 Cal.App.4th 721, 728, 28 Cal.Rptr.2d 672; Rashtian v. BRAC-BH, Inc. (1992) 9 Cal. App.4th 1847, 1853-1854, 12 Cal.Rptr.2d 411; Miller v. Stouffer (1992) 9 Cal. App.4th 70, 84, 11 Cal.Rptr.2d 454.) We concluded that the voters intended Proposition 51 to require apportionment of liability among persons at fault, but did not intend the measure to eliminate vicarious liability for noneconomic damages. (Rashtian, supra, at p. 1854, 12 Cal.Rptr.2d 411; Miller, supra, at pp. 84-85, 11 Cal.Rptr.2d 454; see Srithong, supra, at p. 728, 28 Cal.Rptr.2d 672.) We stated that application of Proposition 51 "necessarily requires independently acting tortfeasors who have some fault to compare." (Rashtian, supra, at p. 1851, 12 Cal.Rptr.2d 411.)
Wimberly gleaned from those opinions a rule of law that Proposition 51 limits a defendant's liability to the plaintiff for noneconomic damages only if the defendant's liability to the plaintiff is based on negligence. (Wimberly, supra, 56 Cal.App.4th at pp. 629-630, 65 Cal.Rptr.2d 532.) Wimberly stated, "Where a defendant's `joint and several liability' is not based on his or her own negligence, but on vicarious liability, defendant cannot invoke Proposition 51 to reduce or eliminate responsibility for plaintiffs noneconomic damages." (Id. at p. 629, 65 Cal.Rptr.2d 532.) Wimberly emphasized that strict products liability is similar to vicarious liability in that under either doctrine, a defendant can be held liable even if the defendant was not negligent, *49 and therefore concluded, "the reasoning of Miller, Rashtian and Srithong applies equally here." (Id. at p. 630, 65 Cal.Rptr.2d 532.)
Wimberly stated further that to limit a defendant's liability for noneconomic damages to a proportionate share based on fault would undermine the purpose of strict products liability: "[T]he potential reduction or elimination of a plaintiffs recovery for noneconomic damages through apportionment of `fault' would reallocate the risks accompanying use of defective products and utterly defeat the principal policy reasons for the adoption of strict product liability." (Wimberly, supra, 56 Cal.App.4th at p. 632, 65 Cal.Rptr.2d 532.) "To any extent the concept of `fault' applies, it is only `"equated with the responsibility for placing a defective product into the stream of commerce...."' [Citation.]" (Ibid.) "Further, potentially reducing or eliminating the defendant's responsibility for noneconomic damages would thwart the public policy of insuring the costs of injuries caused by defective products are borne by those putting them on the market, 'rather than by the injured persons who are powerless to protect themselves.' (Greenman v. Yuba Power Products, Inc., supra, 59 Cal.2d at p. 63, 27 Cal.Rptr. 697, 377 P.2d 897.) Responsibility is to be fixed `wherever it will most effectively reduce the hazards to life and health inherent in defective products that reach the market.' (Escola v. Coca Cola Bottling Co. [(1944)] 24 Cal.2d [453,] 462, 150 P.2d 436.) Potentially leaving the plaintiff with little or no recovery for pain and suffering and other noneconomic damages disserves this purpose.... [¶] In sum, the retention of `joint and several liability' of parties in a defective product's chain of distribution for the plaintiffs full damages without a showing of negligence is essential to the theory of strict product liability." (Id. at pp. 632-633, 65 Cal.Rptr.2d 532.)
Although this comment could have equal application to the impact of Proposition 51 on any tort claim, Wimberly concluded: "Accordingly, we hold Proposition 51 has no application in a strict product liability case where, as here, the plaintiffs injuries are caused solely by a defective product. A strictly liable defendant cannot reduce or eliminate its responsibility to the plaintiff for all injuries caused by a defective product by shifting blame to other parties in the product's chain of distribution who are ostensibly more at `fault,' and therefore may be negligent as well as strictly liable. The defendant's recourse, if not precluded by good faith settlement principles, lies in an indemnity action. [Citations.] [Fn. omitted.]" (Wimberly, supra, 56 Cal.App.4th at p. 633, 65 Cal.Rptr.2d 532; accord, Springmeyer v. Ford Motor Co. (1998) 60 Cal.App.4th 1541, 1575-1576, 71 Cal.Rptr.2d 190.)
Arena v. Owens-Corning Fiberglas Corp. (1998) 63 Cal.App.4th 1178, 74 Cal. Rptr.2d 580 (Arena), a strict liability asbestos exposure case, followed Wimberly, supra, 56 Cal.App.4th 618, 65 Cal.Rptr.2d 532 by holding that defendants in the same chain of distribution of a defective product were jointly and severally liable to the plaintiff for noneconomic damages caused by the product. (Arena, supra, at pp. 1193, 1198, 74 Cal.Rptr.2d 580.) Arena further held that if a particular product was responsible for only part of the plaintiffs injury, the noneconomic damages must be apportioned between separate products with each defendant in the same chain of distribution for a particular product sharing joint and several liability for a proportionate share of noneconomic damages. (Ibid.) Arena stated, "we determine that Proposition 51 is applicable in a strict liability asbestos exposure case where multiple products cause the plaintiffs injuries and the evidence provides a basis to allocate *50 liability for noneconomic damages between the defective products." (Id. at p. 1198, 74 Cal.Rptr.2d 580.) Wilson v. John Crane, Inc. (2000) 81 Cal.App.4th 847, 97 Cal.Rptr.2d 240 (Wilson), another strict liability asbestos exposure case, followed Arena by holding that Proposition 51 applied because the plaintiffs injury was caused by multiple products (Wilson, supra, at p. 852, 97 Cal.Rptr.2d 240), but also implicitly rejected the principal rationales offered in Wimberly, supra, 56 Cal. App.4th 618, 65 Cal.Rptr.2d 532 for not applying Proposition 51 in a strict products liability action.
Wilson rejected the argument that strict products liability is not "`based upon principles of comparative fault,'" (Wilson, supra, 81 Cal.App.4th at p. 852, 97 Cal. Rptr.2d 240, quoting Civ.Code, § 1431.2, subd. (a).) Wilson stated that "fault" for purposes of strict products liability refers to the wrongful conduct of participating in the chain of distribution of a defective product. (Wilson, supra, at p. 853, 97 Cal.Rptr.2d 240.) Wilson noted that the California Supreme Court, in Daly, supra, 20 Cal.3d 725, 144 Cal.Rptr. 380, 575 P.2d 1162 and Safeway, supra, 21 Cal.3d 322, 146 Cal.Rptr. 550, 579 P.2d 441 had extended the system, of comparative fault to defendants whose: liability is based in whole or in part on strict products liability, and therefore concluded, "at the time Proposition 51 was adopted, the phrase 'comparative fault' had an established meaning in the judicial vocabularyone which embraced and included strict products liability, whether or not such inclusion might offend some notions of `fixed semantic consistency.'" (Wilson, supra, at pp. 854-855, 97 Cal.Rptr.2d 240.)
Wilson also rejected the argument that public policy considerations underlying strict products liability favor complete joint and several liability among all defendants, stating that the argument was "simply irrelevant when the legislative branch has spoken through the initiative process." (Wilson, supra, 81 Cal.App.4th at p. 857, 97 Cal.Rptr.2d 240.) Wilson stated further: "The perceived evil to be eliminated by Proposition 51 was the imposition of liability for noneconomic damages far out of proportion to the defendant's share of responsibility for those damages. We see no reason to believe that the voters thought that evil was any less or different when the defendant was a manufacturer held strictly liable for a defective product, particularly when the statute would unquestionably apply to a manufacturer held liable for negligence. The voters chose to use a legal term of art (`comparative fault') which, as we have seen, embraces all such claims." (Id. at p. 858, 97 Cal.Rptr.2d 240.)

d. Proposition 51 Applies in a Strict Products Liability Action Involving a Single Indivisible Injury

The question whether Proposition 51 applies in a strict products liability action is a question of statutory construction. Statutory construction is a question of law that courts review de novo. (Barner v. Leeds (2000) 24 Cal.4th 676, 683, 102 Cal.Rptr.2d 97, 13 P.3d 704.) The judicial task in construing a statute is to ascertain and effectuate the legislative intent or, if the statute was enacted by initiative measure, the intent of the voters who approved the measure. (Hassan v. Mercy American River Hospital (2003) 31 Cal.4th 709, 715, 3 Cal.Rptr.3d 623, 74 P.3d 726; Robert L. v. Superior Court (2003) 30 Cal.4th 894, 900, 135 Cal.Rptr.2d 30, 69 P.3d 951.) The words of the statute are given their ordinary and usual meaning and are construed in the context of the statute as a whole and the entire system of law of which it is a part. (Coachella Valley Mosquito & Vector Control Dist. v. California Public Employment Relations Bd. (2005) 35 Cal.4th 1072, 1089, 29 Cal.Rptr.3d 234, 112 P.3d *51 623; Robert L., supra, at p. 901, 135 Cal. Rptr.2d 30, 69 P.3d 951.) A court must harmonize a statute with other laws so as to give effect to all and avoid anomalies, if possible. (Coachella Valley, supra, at p. 1089, 29 Cal.Rptr.3d 234, 112 P.3d 623; Mejia v. Reed (2003) 31 Cal.4th 657, 663, 3 Cal.Rptr.3d 390, 74 P.3d 166.)
If the language of a statute is unambiguous, the plain meaning governs and it is unnecessary to resort to extrinsic sources to determine the legislative or voters' intent. (Kavanaugh v. West Sonoma County Union High School Dist. (2003) 29 Cal.4th 911, 919, 129 Cal.Rptr.2d 811, 62 P.3d 54.) If the statutory language does not yield a plain meaning, a court may consider extrinsic indicia of intent, including the legislative history of a statute enacted by the Legislature or the analyses and arguments contained in the official ballot pamphlet of a statute enacted by voter initiative, and the historical circumstances of the statute's enactment. (Mejia v. Reed, supra, 31 Cal.4th at p. 663, 3 Cal.Rptr.3d 390, 74 P.3d 166; Robert L. v. Superior Court, supra, 30 Cal.4th at p. 901,135 Cal.Rptr.2d 30, 69 P.3d 951.) "Finally, the court may consider the impact of an interpretation on public policy, for '[w]here uncertainty exists consideration should be given to the consequences that will flow from a particular interpretation.' [Citation.]" (Mejia, supra, at p. 663, 3 Cal.Rptr.3d 390, 74 P.3d 166.)
The express purpose of Proposition 51 is to ameliorate the inequity of holding a defendant liable for all the damages when that defendant shared only a fraction of the fault. (Civ.Code, § 1431.1.) Proposition 51 accomplishes this goal by holding defendants in tort actions "liable in closer proportion to their degree of fault." (Ibid.) Specifically, Civil Code section 1431.2, subdivision (a) relieves defendants of joint and several liability for noneconomic damages, and makes the liability of each defendant for noneconomic damages several only and in direct proportion to the defendant's percentage of fault.
Strict products liability is not liability without fault. Rather, a defendant is at fault for participating in the chain of distribution of a defective product. (Daly, supra, 20 Cal.3d at p. 739, 144 Cal.Rptr. 380, 575 P.2d 1162 ["Regardless of the identity of a particular defendant or his position in the commercial chain the basis for his liability remains that he has marketed or distributed a defective product"]; Wilson, supra, 81 Cal.App.4th at p. 853, 97 Cal. Rptr.2d 240; see Schwartz, Comparative Negligence (4th ed. 2002) Strict Liability and Comparative Fault, § 11.02[a], pp. 236-237.) Thus, unlike vicarious liability based solely on a defendant's status in relation to the responsible actor, strict products liability is based on a defendant's tortious conduct. The trier of fact can assess the culpability of a strictly liable defendant relative to that of the plaintiff and relative to the culpability of other strictly liable defendants in order to arrive at an equitable allocation of loss. (Safeway, supra, 21 Cal.3d at p. 330, 146 Cal. Rptr. 550, 579 P.2d 441; Daly, supra, at p. 738, 144 Cal.Rptr. 380, 575 P.2d 1162.) These prior opinions establish that principles of comparative fault, or "`equitable apportionment or allocation of loss'" (Daly, supra, at p. 736, 144 Cal.Rptr. 380, 575 P.2d 1162), are fully compatible with strict products liability.
The apportionment of liability for noneconomic damages in a strict products liability action pursuant to Proposition 51 would eliminate joint and several liability for noneconomic damages, but would not affect joint and several liability for economic damages. The same is true in any action in which the defendants' liability is joint and several to which Proposition 51 applies. In my view, the plain language of Proposition 51 compels the conclusion that *52 the voters intended to modify the rule of joint and several liability "[i]n any action for personal injury, property damage, or wrongful death, based upon principles of comparative fault" (Civ.Code, § 1431.2, subd. (a), italics added), including a strict products liability action. (Wilson, supra, 81 Cal.App.4th at pp. 855, 858, 97 Cal. Rptr.2d 240.) Contrary to Wimberly, supra, 56 Cal.App.4th at page 632, 65 Cal. Rptr.2d 532, I believe that the elimination of joint and several liability for noneconomic damages would not "utterly defeat" the purposes of strict products liability because the defendants' liability to the plaintiff for economic damages remains joint and several. Moreover, to the extent the application of Proposition 51 to a strict products liability action is incompatible with the original purposes of strict products liability, the express declaration of purpose in Proposition 51 and its substantive requirements changed the law.
The prior opinions of this court holding that Proposition 51 does not eliminate vicarious liability for noneconomic damages (Srithong v. Total Investment Co., supra, 23 Cal.App.4th at p. 728, 28 Cal.Rptr.2d 672; Rashtian v. BRAC-BH, Inc., supra, 9 Cal.App.4th at pp. 1853-1854, 12 Cal. Rptr.2d 411; Miller v. Stouffer, supra, 9 Cal.App.4th at p. 84, 11 Cal.Rptr.2d 454) are not on point. A vicariously liable defendant is liable for the act or omission of another person as a matter of law, despite the absence of independent culpable conduct by the defendant. A vicariously liable defendant stands in the shoes of a culpable person, and the defendant's liability is coextensive with that of the person whose liability is imputed to the defendant. Thus, vicarious liability is not "based upon principles of comparative fault" (Civ.Code, § 1431.2, subd. (a)), and a vicariously liable defendant has no independent fault to compare, as required to apply Proposition 51. Proposition 51 was not intended to abrogate vicarious liability and therefore does not relieve a vicariously liable defendant of imputed liability for noneconomic damages. (Srithong, supra, at p. 728, 28 Cal.Rptr.2d 672; Rashtian, supra, at pp. 1853-1854, 12 Cal.Rptr.2d 411; Miller, supra, at pp. 83-85, 11 Cal.Rptr.2d 454.) Strict products liability, in contrast, is not liability without fault. Unlike a vicariously liable defendant, a defendant liable for strict products liability based on participation in the chain of distribution of a defective product is an actor whose relative culpability can be measured and assessed. (Safeway, supra, 21 Cal.3d at p. 330, 146 Cal.Rptr. 550, 579 P.2d 441; Daly v. General Motors, supra, 20 Cal.3d at p. 738, 144 Cal.Rptr. 380, 575 P.2d 1162.)
Accordingly, I agree with the argument on this point advanced by Bostick and would not follow Wimberly, supra, 56 Cal. App.4th 618, 65 Cal.Rptr.2d 532. To the contrary, it is my view that pursuant to Proposition 51, in a strict products liability action, a defendant's liability to the plaintiff for noneconomic damages caused by a defective product is several only and is limited to a proportionate share of such noneconomic damages based on that defendant's percentage of fault.
Although I would conclude that Proposition 51 applies and that Flex's liability for noneconomic damages therefore is several only, I would still reach the conclusion that Bostick's damages award against Flex must nonetheless be reduced by the full amount of his $7.3 million settlement with Gold's Gym.

2. Section 877 Requires a Reduction by Setoff of the Noneconomic Portion of an Award Against a Nonsettling Defendant But Only to the Extent Necessary to Avoid a Double Recovery by the Plaintiff

a. Section 877

Code of Civil Procedure section 877.6 provides a procedure for an alleged tortfeasor *53 to be relieved of liability to another "joint tortfeasor" for equitable indemnity or contribution through settlement with the plaintiff. "A determination by the court that the settlement was made in good faith shall bar any other joint tortfeasor or co-obligor from any further claims against the settling tortfeasor or co-obligor for equitable comparative contribution, or partial or comparative indemnity, based on comparative negligence or comparative fault." (Id., subd. (c).) The plaintiffs claims against other tortfeasors "claimed to be liable for the same tort" then are reduced in the amount stipulated in the settlement or the amount of consideration paid for the settlement, whichever is greater. (§ 877, subd. (a).)
Section 877 states: "Where a release, dismissal with or without prejudice, or a covenant not to sue or not to enforce judgment is given in good faith before verdict or judgment to one or more of a number of tortfeasors claimed to be liable for the same tort, or to one or more co-obligors mutually subject to contribution rights, it shall have the following effect:
"(a) It shall not discharge any other such party from liability unless its terms so provide, but it shall reduce the claims against the others in the amount stipulated by the release, the dismissal or the covenant, or in the amount of the consideration paid for it whichever is the greater.
"(b) It shall discharge the party to whom it is given from all liability for any contribution to any other parties.
"(c) This section shall not apply to co-obligors who have expressly agreed in writing to an apportionment of liability for losses or claims among themselves.
"(d) This section shall not apply to a release, dismissal with or without prejudice, or a covenant not to sue or not to enforce judgment given to a co-obligor on an alleged contract debt where the contract was made prior to January 1, 1988." (Italics added.)
Section 877 originally was enacted in 1957 and was amended in 1987 to its current language. (Stats.1957, ch. 1700, § 1, p. 3077;[2] Stats.1987, ch. 877, § 2, p. 2148.) Section 877 was enacted as part of a bill that for the first time provided for a right of contribution between tortfeasors (Code Civ. Proc, §§ 875, 876) and established a uniform rule that the plaintiffs settlement with one defendant would not effect a release of other defendants liable for the same injury (§ 877 & subd. (a)).[3] (Stats. 1957, ch. 1700, § 1, pp. 3076-3077, enacting Sen. Bill No. 1510 (1957 Reg. Sess.); see American Motorcycle, supra, 20 Cal.3d at pp. 592, 601, 146 Cal.Rptr. 182, 578 P.2d 899; River Garden Farms, Inc. v. Superior Court (1972) 26 Cal.App.3d 986, 999-1000, 103 Cal.Rptr. 498.) The enactment added sections 875, 876, 877, 878, 879, and 880 to the Code of Civil Procedure. *54 (Stats, 1957, ch. 1700, § 1, pp. 3076-3077.) Section 877 apparently was modeled after section 4 of the Uniform Contribution Among Tortfeasors Act of 1955 (12 West's U. Laws Ann. (1996) U. Contrib. Among Tortfeasors Act (1955), § 4, p. 264). (Tech-Bilt, Inc. v. Woodward-Clyde & Associates (1985) 38 Cal.3d 488, 494, fn. 4, 213 Cal.Rptr. 256, 698 P.2d 159.)
The California Supreme Court has stated that the purposes of section 877 are (1) to maximize the plaintiffs recovery "'for the amount of his injury to the extent fault of others has contributed to it,'" (2) to encourage settlement, and (3) to achieve an equitable apportionment of liability among tortfeasors. (Mesler v. Bragg Management Co. (1985) 39 Cal.3d 290, 304, 216 Cal.Rptr. 443, 702 P.2d 601, italics added.) As suggested by the italicized language, one of the purposes of the setoff requirement in particular is to avoid an unjust double recovery. (Reed v. Wilson (1999) 73 Cal.App.4th 439, 444, 86 Cal. Rptr.2d 510; McComber v. Wells (1999) 72 Cal.App.4th 512, 517, 85 Cal.Rptr.2d 376; Carr v. Cove (1973) 33 Cal.App.3d 851, 854, 109 Cal.Rptr. 449.) The Supreme Court has explained that the setoff requirement also helps to ensure an equitable apportionment of liability among tortfeasors. (Abbott Ford Inc. v. Superior Court (1987) 43 Cal.3d 858, 871-873, 239 Cal.Rptr. 626, 741 P.2d 124.) Section 877 embodies a "strong public policy in favor of encouraging settlement of litigation" by providing incentives to settle to both tortfeasors and injured plaintiffs, in that a settling tortfeasor is discharged from liability for contribution to any other party, while the plaintiffs award against nonsettling defendants is reduced only by the amount of the settlement rather than by the settling defendant's pro rata share of liability.[4] (American Motorcycle, supra, 20 Cal.3d at p. 603, 146 Cal.Rptr. 182, 578 P.2d 899.) American Motorcycle regarded the choice of a pro tanto setoff embodied in section 877, subdivision (a), rather than a pro rata setoff or a setoff in proportion to the settling defendant's apportioned share of liability, as providing a greater incentive to plaintiffs to settle.
Section 877 refers to a settlement with one or more of multiple "tortfeasors claimed to be liable for the same tort" (ibid.) and states that the settlement "shall reduce the claims against the others" (id., subd. (a)) in the greater of the amount stipulated or the amount of consideration paid. The broad language "tortfeasors claimed to be liable for the same tort" encompasses persons claimed to be liable in tort for the same injury whether they acted in concert, concurrently, or successively, and also encompasses persons whose liability is vicarious. (Mesler v. Bragg Management Co., supra, 39 Cal.3d at p. 302, 216 Cal.Rptr. 443, 702 P.2d 601; Ritter v. Technicolor Corp. (1972) 27 Cal. App.3d 152, 154, 103 Cal.Rptr. 686.) The statute does not refer to only "tortfeasors who are jointly liable," nor does it make any distinction between jointly liable tortfeasors and those whose liability is only several.
*55 The statutory language "shall reduce the claims against the others" (§ 877, subd. (a)) thus must necessarily refer to "claims" against nonsettling defendants who are claimed to be liable for the same tort as the settling defendant. A "claim" in this context means a demand for payment of damages and, after the determination of a nonsettling defendant's liability and the amount of damages, a right to payment of damages in a particular amount. (Reed v. Wilson, supra, 73 Cal.App.4th at pp. 444-445, 86 Cal.Rptr.2d 510; see Laurenzi v. Vranizan (1945) 25 Cal.2d 806, 813, 155 P.2d 633 [stating the common law rule]; Black's Law Diet. (8th ed.2004) p. 264, col. 2.) When the introductory paragraph of section 877 is read together with subdivision (a), it is clear that the statute should be construed to mean that the amount of damages to be awarded against a nonsettling defendant "claimed to be liable for the same tort" as a settling defendant must be reduced by the greater of the amount stipulated in the settlement or the amount of consideration paid for the settlement.

b. Effect of Proposition 51

Proposition 51 makes each defendant's liability for noneconomic damages several and in proportion to the defendant's fault, rather than joint and several. (Civ.Code, § 1431.2, subd. (a).) The express purpose of Proposition 51 is to limit each defendant's liability to a proportion of the plaintiffs damages that more closely approximates the defendant's degree of fault. (Civ.Code, § 1431.1, subd. (c) ["to remedy these inequities, defendants in tort actions shall be held financially liable in closer proportion to their degree of fault"].) Proposition 51 accomplishes this by limiting each defendant's liability for noneconomic damages to an amount in proportion to that defendant's percentage of fault. (Civ.Code, § 1431.2, subd. (a); see also Evangelatos v. Superior Court (1988) 44 Cal.3d 1188, 1204, 246 Cal.Rptr. 629, 753 P.2d 585.)
Proposition 51 affects the way that a setoff under section 877 is calculated and applied. In an action subject to Proposition 51, "the claims against the others" (§ 877, subd. (a)) are not unitary claims for damages. Rather, each defendant is liable for separate amounts of economic and noneconomic damages; the former liability is joint and several, while the latter liability is only several. A good faith settlement therefore must be apportioned between economic and noneconomic damages before a setoff can be applied.
Courts have encountered no difficulty in applying section 877 to an award of economic damages after Proposition 51. By apportioning a settlement between economic and noneconomic damages and reducing the total economic damages award first in proportion to the plaintiffs comparative fault, if any, and further by the economic portion of the settlement, Espinoza, supra, (1992) 9 Cal.App.4th 268, 11 Cal. Rptr.2d 498 and its progeny have harmonized section 877 with subsequent common law developments (Li v. Yellow Cab, supra, 13 Cal.3d at p. 829, 119 Cal.Rptr. 858, 532 P.2d 1226) and statutory changes (Civ. Code, § 1431.2). This calculation ensures that the plaintiffs total recovery for economic damages, including the award of economic damages and the economic portion of any good faith settlement, is no greater than the plaintiffs economic loss, reduced in proportion to the plaintiffs share of fault, consistent with the purpose of section 877 to avoid a double recovery. With respect to noneconomic damages, however, Espinoza and its progeny hold that section 877 does not require a setoff for the noneconomic portion of a good faith settlement. As I shall explain, I disagree.
*56 It is my view that in order to be consistent with the purpose of section 877 to avoid a double recovery, the plaintiffs total recovery for noneconomic damages, including the sum of the separate awards of noneconomic damages and the noneconomic portion of any good faith settlements, should be no greater than the plaintiffs total noneconomic loss reduced in proportion to the plaintiffs share of fault. Thus, a noneconomic damages award against a defendant should be reduced, by application of a section 877 setoff, but only to the extent necessary to avoid a double recovery by the plaintiff. If the noneconomic portion of one or more good faith settlements exceeds the total amount of plaintiffs noneconomic loss, reduced in proportion to the plaintiffs share of fault, the award of noneconomic damages against each nonsettling defendant will be reduced to zero by means of a setoff. At the other extreme, if the noneconomic portion of good faith settlements is equal to or less than the total amount of the plaintiffs noneconomic damages apportioned to those settling defendants, the award of noneconomic damages against each nonsettling defendant will not be reduced at all by means of a setoff. In between these two extremes, a noneconomic damages award against a defendant should be reduced by a setoff to the extent necessary to avoid a double recovery by the plaintiff.[5] I believe the cases that have articulated a contrary rule (i.e., Espinoza, supra, 9 Cal. App.4th 268, 11 Cal.Rptr.2d 498 and its progeny) were wrongly decided.

c. Espinoza and Its Progeny Construe Section 877 To Require a Setoff Only With Respect to Claims for Joint and Several Liability

Espinoza, supra, 9 Cal.App.4th 268, 11 Cal.Rptr.2d 498 held that after Proposition 51, only the economic portion of a damages *57 award was subject to a setoff under section 877 and noneconomic damages were not subject to a setoff at all. Hoch, supra, 24 Cal.App.4th 48, 29 Cal.Rptr.2d 615 expounded on this rule from Espinoza, and numerous other opinions have followed the rule without criticism and with little or no discussion. (E.g., Wilson, supra, 81 Cal. App.4th 847, 863-864, 97 Cal.Rptr.2d 240; Ehret v. Congoleum Corp. (1999) 73 Cal. App.4th 1308, 1319-1320, 87 Cal.Rptr.2d 363; McComber v. Wells, supra, 72 Cal. App.4th at p. 518, 85 Cal.Rptr.2d 376; Arena, supra, 63 Cal.App.4th at p. 1199, fn. 20, 74 Cal.Rptr.2d 580; Poire v. C.L. Peck/Jones Brothers Construction Corp. (1995) 39 Cal.App.4th 1832, 1838, 46 Cal. Rptr.2d 631; Greathouse v. Amcord, Inc. (1995) 35 Cal.App.4th 831, 838, 41 Cal. Rptr.2d 561; Conrad v. Ball Corp. (1994) 24 Cal.App.4th 439, 443, 29 Cal.Rptr.2d 441; Regan Roofing Co. v. Superior Court (1994) 21 Cal.App.4th 1685, 1706-1707, 27 Cal.Rptr.2d 62.)[6] In my view and as I discuss extensively below, the rule endorsed by Espinoza and Hoch (and the several cases following their lead) does not properly harmonize the statutory mandate of section 877 with that of Proposition 51 and thereby fails to maximize the desired result of encouraging settlements.
Espinoza, supra, 9 Cal.App.4th 268, 11 Cal.Rptr.2d 498 focused on the language in section 877 "one or more of a number of tortfeasors claimed to be liable for the same tort" and the requirement that a release, dismissal, or covenant not to sue or not to enforce judgment "shall reduce the claims against the others" (id., subd. (a)). Espinoza explained: "Now, however, a personal injury plaintiffs valid `claim' against one such tortfeasor for noneconomic damages can never be the liability of 'the others.' (Civ.Code § 1431.2, supra.) The payment of such a claim by one tortfeasor is not the payment of a claim for which `the others' might ever be held jointly and severally liable. Thus, there is no longer any such claim `against the others' to `reduce.'" (Espinoza, supra, at pp. 274-275, 11 Cal.Rptr.2d 498.) "Section 1431.2 provides that the responsibility for the noneconomic portion of the damages allocated to each defendant shall be several and not joint. Therefore, each defendant is solely responsible for his or her share of the noneconomic damages. Thus, that portion of the settlement attributable to noneconomic damages is not subject to setoff. To do otherwise would, in effect, cause money paid in settlement to be treated as if it was paid as a joint liability." (Id. at pp. 276-277, 11 Cal.Rptr.2d 498.)
Thus, Espinoza, supra, 9 Cal.App.4th 268, 11 Cal.Rptr.2d 498 construed section 877 to require a reduction in a claim *58 against a nonsettling defendant only if the claim pertains to a joint and several liability.[7]Hoch, supra, 24 Cal.App.4th 48, 63, 29 Cal.Rptr.2d 615, following Espinoza, stated more explicitly that section 877, subdivision (a) "presupposes the existence of multiple defendants jointly liable for the same damages." Hoch also focused on the language in section 877 "claimed to be liable for the same tort" and the requirement to reduce "the claims against the others" (§ 877, subd. (a)).[8] Although neither Espinoza nor Hoch explained how that statutory language indicates a legislative intent that `'the claims against the others" (§ 877, subd. (a)) should be reduced only to the extent the claims are for a joint and several liability, both opinions implied that the statutory language "claimed to be liable for the same tort" (§ 877) should be construed to mean "claimed to be liable jointly and severally for the same tort" and that "the claims against the others" (§ 877, subd. (a)) should be construed to refer to the same claims for joint and several liability referenced in the prior phrase. Section 877, however, contains no language supporting such an interpretation. Neither Espinoza nor Hoch satisfactorily explained why section 877 should be subjected to a statutory construction so inconsistent with its plain language.

d. The Plain Language of Section 877 Does Not Limit the Setoff Requirement Only to Claims Based on Joint and Several Liability

"Our fundamental task in construing a statute is to ascertain the intent of the lawmakers so as to effectuate the purpose of the statute. [Citation.] We begin by examining the statutory language, giving the words their usual and ordinary meaning. [Citation.] If there is no ambiguity, then we presume the lawmakers meant what they said, and the plain meaning of the language governs. [Citations.] If, however, the statutory terms are ambiguous, then we may resort to extrinsic sources, including the ostensible objects to be achieved and the legislative history. [Citation.] In such circumstances, we '"select the construction that comports most closely with the apparent intent of the Legislature, with a view to promoting rather than defeating the general purpose of the statute, and avoid an interpretation that would lead to absurd consequences." [Citation.]' [Citations.]" (Day v. City of Fontana (2001) 25 Cal.4th 268, 272, 105 Cal.Rptr.2d 457, 19 P.3d 1196.) In construing a statute, a court can neither omit words that are included in the statute nor insert words that are omitted. (Code Civ. Proc, § 1858; California Fed. Savings & Loan Assn. v. City of Los Angeles (1995) 11 Cal.4th 342, 349, 45 Cal.Rptr.2d 279, 902 P.2d 297.) "We may not, under the *59 guise of construction, rewrite the law or give the words an effect different from the plain and direct import of the terms used." (California Fed. Savings & Loan, supra, at p. 349, 45 Cal.Rptr.2d 279, 902 P.2d 297) "We are not authorized to insert qualifying provisions not included, and may not rewrite the statute to conform to an assumed intention which does not appear from its language. [Citation.]" (Stop Youth Addiction, Inc. v. Lucky Stores, Inc. (1998) 17 Cal.4th 553, 573, 71 Cal.Rptr.2d 731, 950 P.2d 1086.)
The language "claimed to be liable for the same tort" (§ 877) is not expressly limited to joint and several liability. Regardless of whether the 1957 Legislature anticipated that the then-prevailing rule of joint and several liability for multiple tortfeasors responsible for the same indivisible injury (American Motorcycle, supra, 20 Cal.3d at pp. 586-587, 146 Cal.Rptr. 182, 578 P.2d 899) might be modified in the future, the broad language used by the Legislature plainly encompasses tortfeasors responsible for the same indivisible injury whether their liability is joint and several or only several. (See Greathouse v. Amcord Inc., supra, 35 Cal.App.4th at p. 840, 41 Cal.Rptr.2d 561 ["The setoff provided by Code of Civil Procedure section 877 applies whenever the acts of multiple defendants `have combined to cause "one indivisible injury."' [Citations.]"]; May v. Miller (1991) 228 Cal.App.3d 404, 409, 278 Cal.Rptr. 341 ["The only relevant question in applying section 877 is whether there was one indivisible injury caused by two or more parties."].) There is no indication in either the words of section 877 or in its legislative history that the Legislature intended the required setoff to apply to only a joint and several liability. Moreover, as I have already stated, the statutory purpose of avoiding a double recovery can be fully achieved only if the phrases "claimed to be liable for the same tort" (§ 877) and "the claims against the others" (§ 877, subd. (a)) are construed to include claims for both economic and noneconomic damages, in accordance with the plain meaning of those words, and reduce the plaintiffs claims for noneconomic damages against the nonsettling defendants to the extent necessary to avoid a double recovery. Construed in this manner, the setoff requirement, in my view, would also provide a greater incentive to settlement and help to ensure an equitable apportionment of liability among tortfeasors through the resulting right of equitable indemnity in favor of a settling defendant against a nonsettling defendant.

e. Proposition 51 Does Not Preclude a Setoff for the Noneconomic Portion of a Settlement

Hoch, supra, 24 Cal.App.4th at page 64, 29 Cal.Rptr.2d 615 also stated that Civil Code section 1431.2, subdivision (a) expressly requires the court to enter a judgment awarding noneconomic damages against each defendant in proportion to that defendant's fault without any reduction. Referring to the language of Civil Code section 1431.2, subdivision (a) stating that a judgment "shall be rendered" against each defendant for the amount of noneconomic damages apportioned to that defendant,[9]Hoch stated: "[S]ection 1431.2(a) speaks directly and unambiguously to the situation here presented. When a jury allocates comparative fault and awards some amount of noneconomic damages, judgment for those damages *60 'shall be rendered' against each defendant in proportion to its fault. The trial court here did no more than follow that clear statutory command."[10] (Hoch, supra, at p. 64, 29 Cal.Rptr.2d 615.)
A court could construe Civil Code section 1431.2, subdivision (a) to require an award of noneconomic damages against each defendant in proportion to that defendant's percentage of fault notwithstanding the setoff requirement of section 877 only if it could conclude that Proposition 51 limits or partially repeals that setoff requirement. Proposition 51, however, does not expressly refer to or limit the setoff requirement of section 877. It is therefore necessary to harmonize section 877 with Proposition 51, if possible. (Mejia v. Reed, supra, 31 Cal.4th at p. 663, 3 Cal.Rptr.3d 390, 74 P.3d 166.) Proposition 51 can be construed as an implied limitation on the setoff requirement of section 877 only if there is no rational basis on which to harmonize the statutes. (Garcia v. McCutchen (1997) 16 Cal.4th 469, 476-477, 66 Cal. Rptr.2d 319, 940 P.2d 906.) "`[A]ll presumptions are against a repeal by implication. [Citations.]' [Citation.] Absent an express declaration of legislative intent [or voters' intent], we will find an implied repeal 'only when there is no rational basis for harmonizing the two potentially conflicting statutes [citation], and the statutes are "irreconcilable, clearly repugnant, and so inconsistent that the two cannot have concurrent operation."' [Citation.]" (Ibid.)
The construction of Proposition 51 that I propose is consistent with section 877. The express purpose of Proposition 51 is to limit each defendant's liability to a proportion of the plaintiffs damages that more closely approximates the defendant's degree of fault, as already stated. (Civ. Code, § 1431.1, subd. (c) ["to remedy these inequities, defendants in tort actions shall be held financially liable in closer proportion to their degree of fault"].) Proposition 51 accomplishes this by limiting each defendant's liability for noneconomic damages to an amount in proportion to that defendant's percentage of fault. (Civ. Code, § 1431.2, subd. (a) ["Each defendant shall be liable only for the amount of noneconomic damages allocated to that defendant in direct proportion to that defendant's percentage of fault, and a separate judgment shall be rendered against that defendant for that amount"]; see Evangelatos v. Superior Court, supra, 44 Cal.3d at p. 1204, 246 Cal.Rptr. 629, 753 P.2d 585 ["the measure quite clearly is simply intended to limit the potential liability of an individual defendant for noneconomic damages to a proportion commensurate with that defendant's personal share of fault"].) Thus, Proposition 51 establishes a ceiling and not a floor. There is no indication that Proposition 51 was intended to ensure that a defendant pay to a plaintiff at least its proportionate share of damages notwithstanding the setoff required by section 877. It simply established that a defendant could not be required to pay more.
In light of the express statutory purpose to limit defendants' liability, and absent any express limitation in Proposition 51 on the setoff requirement of section 877, the *61 language "shall be rendered" (Civ. Code, § 1432.1, subd. (a)) cannot be construed as an implied limitation, with respect to noneconomic damages, on the section 877 setoff requirement. Rather, Proposition 51 can easily be harmonized with section 877 by construing "a separate judgment shall be rendered against that defendant for that amount" (Civ.Code, § 1432.1, subd. (a)) to refer to the amount of the defendant's liability before any setoff, to be reduced in accordance with section 877, if applicable. Accordingly, I would conclude that Civil Code section 1432.1, subdivision (a) does not preclude a setoff for the amount of a settlement attributable to noneconomic damages.

f. Neither Proposition 51 Nor Section 877 Reflects or Supports the Policy Rationale Endorsed by Hoch Permitting a Plaintiff to Receive a Double Recovery

Hoch, supra, 24 Cal.App.4th at page 65, 29 Cal.Rptr.2d 615 noted that, unlike the rule of joint and several liability that formerly prevailed, the rule of several liability for noneconomic damages under Proposition 51 places the burden of a low settlement (i.e., a settlement for less than the amount later apportioned to the settling defendant by the trier of fact) on the plaintiff because the plaintiff cannot thereafter recover from nonsettling defendants more than the portion of the total noneconomic damages allocated to them by the jury. Thus, if the noneconomic portion of the settlement is less than the settling defendant's proportionate share of the noneconomic damages ultimately awarded to the plaintiff by the trier of fact, the plaintiff will bear the shortfall. Hoch's response to this statutorily mandated result was to conclude that since plaintiffs must bear the risk of a low settlement, "equity demands they also be entitled to retain the benefit of their bargain when the settlement is generous." (Id. at p. 66, 29 Cal.Rptr.2d 615.) Under Civil Code section 1431.2, subdivision (a), as construed in Hoch, a plaintiff "retains the benefit" of a high settlement (i.e., a settlement for more than the amount later apportioned to the settling defendant by the trier of fact) and thus can recover through settlement and judgment more than the total amount of noneconomic damages awarded. (Hoch, supra, at p. 66, 29 Cal.Rptr.2d 615.)
Hoch, supra, 24 Cal.App.4th 48, 29 Cal. Rptr.2d 615 rejected the argument that a plaintiff is not entitled to a double recovery in these circumstances for three reasons. First, the court stated that it would be unfair to impose the risk of a low settlement on a plaintiff without allowing the plaintiff to retain the benefit of a high settlement. (Id. at p. 66, 29 Cal.Rptr.2d 615.) Second, Hoch stated that although a plaintiff should not be allowed to recover a double recovery for an indivisible injury, the plaintiffs noneconomic harm is divisible because Civil Code section 1431.2, subdivision (a) requires a separate award of noneconomic damages against each defendant. (Hoch, supra, at p. 67, 29 Cal. Rptr.2d 615.) Third, Hoch distinguished settlement dollars from damages and rejected the notion that the former can substitute for the latter dollar for dollar. "`[Settlement dollars are not the same as damages. Settlement dollars represent a contractual estimate of the value of the settling tortfeasor's liability and may be more or less than the proportionate share of the plaintiff[`]s damages. The settlement includes not only damages, but also the value of avoiding the risk, expense, and adverse public exposure that accompany going to trial. There is no conceptual inconsistency in allowing a plaintiff to recover more from a settlement or partial settlement than he could receive as damages. [Citations.]' (Duncan v. Cessna *62 Aircraft Co. [ (Tex.1984) ] 665 S.W.2d [414,] 431-32.)" (Hoch, supra, at pp. 67-68, 29 Cal.Rptr.2d 615.) With all respect, I believe this reasoning is wrong on all three grounds.
I am not persuaded by the "equitable" public policy rationale in Hoch, supra, 24 Cal.App.4th 48, 29 Cal.Rptr.2d 615. I agree that Proposition 51 places the burden of a low settlement on the plaintiff with respect to noneconomic damages. That is the direct result of the express statutory language approved by the voters. However, I see no expression in either Proposition 51 or section 877 of the purported public policy endorsed in Hoch that in return a plaintiff should be allowed to retain the benefit of a high settlement. If imposing the risk of a low settlement on the plaintiff discourages a plaintiff from settling, that is a direct result of Proposition 51, which favors remedying the "inequity and injustice" (Civ.Code, § 1431.1, subd. (a)) of complete joint and several liability over ensuring that an injured plaintiff receive full compensation. Proposition 51 neither expressly nor impliedly repeals the setoff requirement of section 877 with respect to noneconomic damages as a counterbalance. Hoch simply added a judicial restriction to the application of section 877 that was not required by either the Legislature or the voters.
The first of the three reasons offered in Hoch, supra, 24 Cal.App.4th at pages 66-68, 29 Cal.Rptr.2d 615, in order to justify allowing the plaintiff a double recovery was fairness. Bat Hoch's notion of fairness was a judicial policy choice not included in or justified by either section 877 or Proposition 51. The voters endorsed the fairness of imposing the risk of a low settlement on a plaintiff without allowing the plaintiff to retain the benefit of a high settlementthat is, a double recoveryby approving an initiative measure that does exactly that by making liability for noneconomic damages several only, without limiting the setoff requirement under section 877. As already noted, it is necessary to harmonize Proposition 51 with section 877 in a manner that gives effect to both (Mejia v. Reed, supra, 31 Cal.4th at p. 663, 3 Cal.Rptr.3d 390, 74 P.3d 166), rather than impose a notion of "fairness" that is not expressed in either statute.
The second reason offered in Hoch, supra, 24 Cal.App.4th 48, 29 Cal.Rptr.2d 615, that a high settlement together with an unreduced apportioned award of noneconomic damages is not a double recovery because the plaintiffs noneconomic harm is divisible, is contrary to American Motorcycle, supra, 20 Cal.3d at page 588, 146 Cal.Rptr. 182, 578 P.2d 899: "[T]he simple feasibility of apportioning fault on a comparative negligence basis does not render an indivisible injury `divisible' for purposes of the joint and several liability rule." Just as the apportionment of damages does not render an indivisible injury into separate, divisible injuries so as to defeat joint and several liability, the apportionment of damages does not render an indivisible injury into separate, divisible injuries so as to justify a recovery in excess of the plaintiffs total noneconomic loss.
The third reason offered in Hoch, supra, 24 Cal.App.4th 48, 29 Cal.Rptr.2d 615, that settlement dollars cannot substitute dollar for dollar with damages, is contrary to section 877, subdivision (a), which requires a pro tanto reduction by the amount of the settlement: "it shall reduce the claims against the others in the amount stipulated by the release, the dismissal or the covenant, or in the amount of the consideration paid for it whichever is greater" (ibid.). Section 877 does not discount settlement dollars to reflect any difference between settlement dollars and damages, so a court applying section 877 should not do so.

*63 g. The Application of Section 877 to the Noneconomic Portion of Good Faith Settlements Would Provide a Greater Incentive to the Settlement of Multiple-Defendants Tort Cases

Hoch, supra, 24 Cal.App.4th at pages 64-66, 29 Cal.Rptr.2d 615 also stated that to impose the risk of a low settlement on a plaintiff without allowing the plaintiff to retain the benefit of a high settlement would discourage the plaintiff from settling with fewer than all defendants. Hoch stated: "If the settlement was `high,' the nonsettling defendants will reap the benefit, paying less than their fault-share of the noneconomic damages. [Fn. omitted.] This would be inequitable and would provide 'little incentive for the injured person to settle with one or fewer than all of the tortfeasors.' [Citations.]" (Id. at pp. 65-66, 29 Cal.Rptr.2d 615.) Concomitantly, Hoch suggested that to allow the plaintiff to retain the benefit of a high settlement with respect to noneconomic damages would encourage the plaintiff to settle. (Id. at pp. 64-65, 29 Cal.Rptr.2d 615.) Neither Espinoza, supra, 9 Cal.App.4th 268, 11 Cal.Rptr.2d 498 nor Hoch discussed or mentioned, however, the impact that their decisions would have on the motives of a settling defendant, whose agreement would necessarily be essential to any settlement.
A settling defendant can recover equitable indemnity from a nonsettling defendant to the extent the settling defendant has discharged a liability that the nonsettling defendant should be responsible to pay, as discussed in section 3, post.[11] The rule from Espinoza, supra, 9 Cal.App.4th 268, 11 Cal.Rptr.2d 498 and Hoch, supra, 24 Cal.App.4th 48, 29 Cal.Rptr.2d 615 allows a plaintiff to retain the benefit of a high settlement even if it results in a double recovery, rather than reduce the noneconomic damages award against a nonsettling defendant to the extent necessary to avoid a double recovery. By denying a setoff, Espinoza and Hoch preclude any opportunity for a settling defendant to recover equitable indemnity from a nonsettling defendant for any part of the noneconomic portion of a settlement.
The rule suggested above, in contrast, would require a setoff for the noneconomic portion of a settlement to the extent necessary to avoid a double recovery by the plaintiff. If such a setoff were required, a settling defendant would be allowed to recover equitable indemnity from a nonsettling defendant for all or part of the noneconomic portion of a high settlement, depending on the circumstances. A defendant contemplating settlement in a multiple-defendant tort case would be more likely to pay a greater amount if there existed an opportunity to recover from one or more nonsettling defendants not only the excess economic portion of a high settlement (i.e., the amount by which the economic portion of the settlement exceeds the amount of economic damages later apportioned to the settling defendant by the trier of fact) but also the excess noneconomic portion of a high settlement (i.e., the amount by which the noneconomic portion of the settlement exceeds the amount of noneconomic damages later apportioned to the settling defendant by the trier of fact). Particularly in cases where noneconomic damages may be substantial, the ability to recovery indemnity for the noneconomic portion of a high settlement in this manner, rather than be required to bear the full cost of settlement as to noneconomic damages regardless of the apportionment *64 of fault by the trier of fact, provides a significantly greater incentive for defendants to agree to and pay greater amounts in settlement. Such a result would benefit plaintiffs as well and bring about more settlements. In my view, this would encourage settlements far more than a rule that precluded any indemnity against the nonsettling defendant for the noneconomic portion of a settlement. In addition, the settling defendant's opportunity for such an indemnity recovery would be a complete answer to the concern expressed in Hoch, supra, 24 Cal.App.4th 48, 29 Cal.Rptr.2d 615 that a nonsettling defendant would reap an inequitable windfall if a setoff were permitted as to noneconomic damages.
Moreover, despite the changes effected by Proposition 51, section 877 continues to provide both tortfeasors and injured plaintiffs with ample incentives to settle. As explained in American Motorcycle, supra, 20 Cal.3d at pages 603-604, 146 Cal.Rptr. 182, 578 P.2d 899, section 877 provides plaintiffs an incentive to settle in the choice of a pro tanto setoff rather than an apportioned share setoff, and provides tortfeasors an incentive to settle by discharging settling tortfeasors from liability for contribution to any other party. (American Motorcycle, supra, at pp. 603-604, 146 Cal.Rptr. 182, 578 P.2d 899.) Those provisions, and the rule that a settling tortfeasor is discharged from liability for equitable indemnity as well (§ 877.6, subd. (c); American Motorcycle, supra, at p. 604, 146 Cal.Rptr. 182, 578 P.2d 899), continue to provide both tortfeasors and injured plaintiffs with incentives to settle. Settlement often is in the best interests of both parties for other reasons as well, such as to avoid the costs, delay, and uncertainty of litigation and a potential appeal. In my view, there is no need to sanction a double recovery by the plaintiff in order to encourage the plaintiff to settle,[12] and, as I have explained, to do so effectively deprives the settling defendant of a significant incentive to pay a greater amount in settlement.

h. The Suggested Rule Serves all the Purposes of Section 877 and Complies with the Statutory Mandate of Proposition 51

As previously stated, the purposes of section 877 are (1) to maximize the plaintiffs recovery "`for the amount of his injury to the extent fault of others has contributed to it,'" while avoiding a double recovery, (2) to encourage settlement, and (3) to achieve an equitable apportionment of liability among tortfeasors. (Mesler v. Bragg Management Co., supra, 39 Cal.3d at p. 304, 216 Cal.Rptr. 443, 702 P.2d 601, italics added.) Unlike the rule from Espinoza, supra, 9 Cal.App.4th 268, 11 Cal. Rptr.2d 498 and Hoch, supra, 24 Cal. App.4th 48, 29 Cal.Rptr.2d 615, the rule I suggest serves all of these purposes. First, it maximizes the plaintiffs recovery while avoiding a double recovery by reducing the plaintiffs noneconomic damages award against a nonsettling defendant to *65 the extent necessary to avoid a double recovery. Second, this rule encourages settlement because a defendant is more likely to agree to a higher settlement if there may be an opportunity to recover from a nonsettling defendant the excess noneconomic portion of a high settlement as well as the economic portion. Third, this rule ensures a more equitable apportionment of liability among tortfeasors by providing an opportunity for a settling defendant, through equitable indemnity, to recover from a nonsettling defendant an amount that the latter should be responsible to pay.
The suggested rule also complies with the statutory mandate of Proposition 51 by ensuring that each defendant's liability for noneconomic damages is limited to an amount in proportion to that defendant's percentage of fault. The proposed setoff calculation (see fn. 5, ante) is designed to ensure exactly that and to further ensure that the plaintiffs total recovery for noneconomic damages, including the award of noneconomic damages against nonsettling defendants and the noneconomic portion of any good faith settlement, is no greater than the plaintiffs total noneconomic loss reduced in proportion to the plaintiffs share of fault, consistent with section 877.

i. This Analysis Is Consistent with the Result But Not the Reasoning of Some of the Precedents

In Espinoza, supra, 9 Cal.App.4th at page 270, 11 Cal.Rptr.2d 498, the jury found that the settling defendant was 45 percent at fault, the nonsettling defendant was 45 percent at fault, and the plaintiff was 10 percent at fault. The settling defendant's apportioned share of the $15,000 noneconomic damages award therefore was $6,750, and the nonsettling defendant's apportioned share of noneconomic damages was an equal amount. Espinoza determined that the economic portion of the $5,000 settlement was $1,467.77 (and the noneconomic portion was $3,532.23) by multiplying the total settlement amount by the ratio of economic damages to the total damages awarded by the jury ($21,242.94). (Id. at p. 273, 11 Cal.Rptr.2d 498.) The court reduced by means of a setoff the economic damages award against the nonsettling defendant by that amount. (Ibid.) The court, however, declined to reduce the apportioned noneconomic damages award against the nonsettling defendant for the reasons discussed above. I would reach exactly the same conclusion with respect to noneconomic damages, but for a different reason: The nonsettling defendant was not entitled to any reduction in the apportioned award of noneconomic damages because the settling defendant had paid less than its apportioned share of noneconomic damages. Thus, no reduction in the noneconomic damages award against the nonsettling defendant was necessary in order to avoid a double recovery. Specifically, no reduction was necessary because the plaintiffs total noneconomic loss reduced in proportion to the plaintiffs share of fault, minus the noneconomic portion of the settlement, was greater than the nonsettling defendant's apportioned share of noneconomic damages.
This conclusion is therefore consistent with the result, but not the reasoning, of Espinoza, supra, 9 Cal.App.4th 268, 11 Cal.Rptr.2d 498. The same is true of Greathouse v. Amcord Inc., supra, 35 Cal. App.4th at pages 837-838, 41 Cal.Rptr.2d 561, in which the denial of a setoff for noneconomic damages did not result in a double recovery of noneconomic damages because the settling defendants had paid less than their apportioned share of noneconomic damages. The same cannot be said, however, of other opinions applying the rule from Espinoza that allowed the plaintiffs total recovery of noneconomic *66 damages to exceed the plaintiffs noneconomic losses reduced in proportion to the plaintiffs share of fault. (See e.g., McComber v. Wells, supra, 72 Cal.App.4th at pp. 516, 523, 85 Cal.Rptr.2d 376 [the plaintiffs total recovery of noneconomic damages from good faith settlements and an award against a nonsettling defendant was $138,677.27, while the plaintiffs noneconomic loss reduced in proportion to the plaintiffs share of fault was only $83,250]; Hoch, supra, 24 Cal.App.4th at p. 62, 29 Cal.Rptr.2d 615 [the plaintiffs total recovery of noneconomic damages from good faith settlements and an award against a nonsettling defendant was $557,500, while the plaintiffs noneconomic loss reduced by the decedent's share of fault was only $400,000].)

j. This Analysis Is Not Precluded by the Principles of Stare Decisis

I do not suggest a departure from 14 years of precedent lightly. The California Supreme Court has stated: "It is, of course, a fundamental jurisprudential policy that prior applicable precedent usually must be followed even though the case, if considered anew, might be decided differently by the current justices. This policy, known as the doctrine of stare decisis, `is based on the assumption that certainty, predictability and stability in the law are the major objectives of the legal system; i.e., that parties should be able to regulate their conduct and enter into relationships with reasonable assurance of the governing rules of law' [Citation.] [¶] It is likewise well established, however, that the foregoing policy is a flexible one which permits this court to reconsider, and ultimately to depart from, our own prior precedent in an appropriate case. [Citation.] As we stated in Cianci v. Superior Court (1985) 40 Cal.3d 903, 924 [221 Cal.Rptr. 575, 710 P.2d 375], `[although the doctrine [stare decisis] does indeed serve important values, it nevertheless should not shield court-created error from correction.'" (Moradi-Shalal v. Fireman's Fund Ins. Companies (1988) 46 Cal.3d 287, 296, 250 Cal.Rptr. 116, 758 P.2d 58.)
"`Considerations of stare decisis have special force in the area of statutory interpretation, for here, unlike in the context of constitutional interpretation, the legislative power is implicated, and [the Legislature] remains free to alter what we have done.'" (People v. Latimer (1993) 5 Cal.4th 1203, 1213, 23 Cal.Rptr.2d 144, 858 P.2d 611, quoting Patterson v. McLean Credit Union (1989) 491 U.S. 164, 172-173 [109 S.Ct. 2363, 105 L.Ed.2d 132].) "This is not to say that decisions of statutory interpretation may never be overruled.... We have recognized that legislative inaction alone does not necessarily imply legislative approval. 'The Legislature's failure to act may indicate many things other than approval of a judicial construction of a statute: the sheer pressure of other and more important business, political considerations, or a tendency to trust to the courts to correct their own errors...."' (Ibid., quoting County of Los Angeles v. Workers' Comp. Appeals Bd. (1981) 30 Cal.3d 391, 404, 179 Cal.Rptr. 214, 637 P.2d 681.) Accordingly, in construing a statute we should not "sacrifice legislative policies" at the altar of stare decisis. (Landrum v. Superior Court (1981) 30 Cal.3d 1, 14, 177 Cal.Rptr. 325, 634 P.2d 352.)
Considerations of reliance "are often crucial" in determining the strength of stare decisis. (People v. Latimer, supra, 5 Cal.4th at p. 1213, 23 Cal.Rptr.2d 144, 858 P.2d 611.) "Parties, society, and legislative bodies may act in reliance on a particular statutory interpretation; overruling that interpretation might have undesirable consequences not present at the time of the original decision. 'Stare decisis has added force when the legislature, in the *67 public sphere, and citizens, in the private realm, have acted in reliance on a previous decision, for in this instance overruling the decision would dislodge settled rights and expectations or require an extensive legislative response.'" (Id. at pp. 1213-1214, 23 Cal.Rptr.2d 144, 858 P.2d 611, quoting Hilton v. South Carolina Public Railways Com'n (1991) 502 U.S. 197, 202 [112 S.Ct. 560,116 L.Ed.2d 560].)
I believe that these well-settled principles do not preclude the conclusion that Espinoza, supra, 9 Cal.App.4th 268, 11 Cal.Rptr.2d 498 and Hoch, supra, 24 Cal. App.4th 48, 29 Cal.Rptr.2d 615 were wrongly decided. The suggested rule directly affects only parties in a multipledefendant tort case involving a high settlement where the plaintiff would be entitled to a double recovery of noneconomic damages under the principles established in Espinoza and Hoch. To the extent the plaintiff may have entered into the settlement motivated in part by the prospect of a double recovery, the plaintiff is not deprived of the benefits of the settlement avoiding the costs, delay, the uncertainty of litigation against the settling defendant, obtaining money to fund the litigation against the nonsettling defendants, and other potential benefitsand suffers no cognizable prejudice by the denial of a double recovery which, in my view, is statutorily precluded. The settling defendant who may have agreed to settle in spite of the rule from Espinoza and Hoch also suffers no prejudice if the plaintiff is denied a double recovery. Indeed, under the suggested rule, such a defendant would obtain the benefit of a right of equitable indemnity arising from the setoff. Finally, I am aware of no legislation enacted in reliance on the rule from Espinoza and Hoch, and anticipate no need for a legislative response to a change in the rule. Accordingly, I would conclude that there are no significant reliance interests at stake and that the interests of "certainty, predictability, and stability" in the law should yield to the paramount need to give full recognition to the express language and legislative purposes of section 877 as well as the requirement that it be harmonized with Proposition 51.

k. There Is No Error in the Award of Damages Against Flex

The court awarded Bostick $7,347,470 in damages against Flex, including $1 in punitive damages, after reducing the amount awarded by the jury by the full amount of the Gold's Gym settlement. Although the court's calculation was based on the conclusion that Proposition 51 did not apply in this case, I would reach the same result, despite my disagreement with that conclusion, by applying the calculations set forth in footnote 5, ante:
1. Reduce the total damages award by the plaintiffs apportioned share and the total amount of good faith settlements:

 16,274,966.00 total damages award
 - 1,627,496.60 plaintiffs 10% apportioned share
 - 7,300,000.00 good faith settlement with Gold's Gym
 _______________
 = 7,347,469.40 Reduced Award

2. Determine the economic portion of the Reduced Award by multiplying the Reduced Award by the ratio of total economic damages to the total damages award:

 7,347,469.40 Reduced Award
 x 3,274,966.00 total economic damages
 + 16,274,966.00 total damages award
 _______________
 = 1,478,510.77 Reduced Economic Award

3. Determine the noneconomic portion of the Reduced Award by multiplying the Reduced Award by the ratio of total noneconomic damages to the total damages award:

 7,347,469.40 Reduced Award
 x 13,000,000.00 total noneconomic damages
 - 16,274,966.00 total damages award
 _______________
 = 5,868,958.63 Reduced Noneconomic Award

4. Determine a preliminary noneconomic damages award against each nonsettling *68 defendant by apportioning the Reduced Noneconomic Award among the nonsettling tortfeasors:

 5,868,958.63 Reduced Noneconomic Award
 x 90 Flex's % of fault
 (100-10) 100%combined % of fault of Bostick
 _______________
 and "other entities"
 = 5,868,958.63 Preliminary Noneconomic Award
 against Flex[13]
5. Determine the maximum noneconomic damages award against each nonsettling defendant that is permissible under Proposition 51:

 90 Flex's % of fault
 x 13,000,000.00 total noneconomic damages
 ________________
 = 11,700,700.00 Proposition 51 Limit against Flex

6. Enter a judgment awarding the Reduced Economic Award against the nonsettling defendants jointly and severally and awarding against each defendant severally the tesser of the Preliminary Noneconomic Award or the Proposition 51 Limit:

 1,478,510.77 Reduced Economic Award
 + 5,868,958.63 Preliminary Noneconomic Award
 _______________
 against Flex
 = 7,347,469.40 total award of compensatory damages
 against Flex

The total award of compensatory damages against Flex plus $1 in punitive damages makes a total award of compensatory and punitive damages of $7,347,470.40. That figure rounded to the nearest dollar is $7,347,470, which is the total amount actually awarded by the trial court. I would therefore affirm the judgment on the complaint in that amount.

3. The Doctrine of Equitable Indemnity Applies to Payments for Both Economic and Noneconomic Damages

a. Principles of Equitable Indemnity

Flex contends Gold's Gym can recover equitable indemnity only for the economic portion of its settlement with Bostick. I disagree. Equitable indemnity is an equitable doctrine that apportions responsibility among tortfeasors responsible for the same indivisible injury on a comparative fault basis. "[T]he equitable indemnity doctrine originated in the common sense proposition that when two individuals are responsible for a loss, but one of the two is more culpable than the other, it is only fair that the more culpable party should bear a greater share of the loss." (American Motorcycle, supra, 20 Cal.3d at p. 593, 146 Cal.Rptr. 182, 578 P.2d 899.) Although equitable indemnity began as an all-or-nothing rule, American Motorcycle modified the doctrine to allow a concurrent tortfeasor to obtain indemnity from another concurrent tortfeasor on the basis of comparative fault. "[I]n the great majority of cases ... equity and fairness call for an apportionment of loss between the wrongdoers in proportion to their relative culpability, rather than the imposition of the entire loss upon one or the other tortfeasor." (Id. at p. 595, 146 Cal.Rptr. 182, 578 P.2d 899.) "In order to attain such a system, in which liability for an indivisible injury caused by concurrent tortfeasors will be borne by each individual tortfeasor 'in direct proportion to [his] respective fault,' we conclude that the current equitable indemnity rule should be modified to permit a concurrent tortfeasor to obtain partial indemnity from other concurrent tortfeasors on a comparative fault basis." (Id. at p. 598, 146 Cal.Rptr. 182, 578 P.2d 899.)
The equitable basis for indemnity is the law of restitution. A person is unjustly enriched at the expense of another person *69 when the latter discharges a liability that the former should be responsible to pay. (Western Steamship Lines, Inc. v. San Pedro Peninsula Hospital (1994) 8 Cal.4th 100, 108-109, 32 Cal.Rptr.2d 263, 876 P.2d 1062 (Western Steamship).)[14] Equitable indemnity apportions the loss and determines how much each tortfeasor should be responsible to pay based on comparative fault. (Western Steamship, supra, at p. 109, 32 Cal.Rptr.2d 263, 876 P.2d 1062.) Indemnification from a tortfeasor that has paid less than its apportioned share based on comparative fault to a tortfeasor that has paid more than its apportioned share is restitutionary in order to avoid unjust enrichment. (Ibid.; Tatum v. Armor Elevator Co. (1988) 203 Cal.App.3d 1315, 1320, 250 Cal.Rptr. 775.) A tortfeasor that has paid more than its share of a loss either in settlement or pursuant to a judgment therefore ordinarily has a right of indemnity on a comparative fault basis against a nonsettling tortfeasor that has paid less than its share of the same loss.
As already discussed, a plaintiffs claim against a nonsettling defendant should be reduced by the amount of a prior good faith settlement to the extent necessary to avoid a double recovery, pursuant to section 877. A nonsettling defendant benefits from any reduction of its liability. For a nonsettling defendant to retain the benefit of a reduction of its liability for damages below its apportioned share based on comparative faultthat is, the amount that it should be responsible to paywithout indemnifying the settling defendant would constitute unjust enrichment. (Western Steamship, supra, 8 Cal.4th at pp. 108-109, 32 Cal.Rptr.2d 263, 876 P.2d 1062; Tatum v. Armor Elevator Co., supra, 203 Cal.App.3d at p. 1320, 250 Cal.Rptr. 775.) To avoid unjust enrichment, therefore, a settling defendant ordinarily is entitled to indemnity in the amount that the settlement reduced the damages recoverable against the nonsettling defendant below the nonsettling defendant's apportioned share of damages. As I have argued above, this reasoning should hold true for both economic and noneconomic damages.

b. Munoz v. Davis and its Progeny

Union Pacific Corp. v. Wengert (2000) 79 Cal.App.4th 1444, 95 Cal.Rptr.2d 68 (Wengert) held that a settling tortfeasor could not recover equitable indemnity from a nonsettling tortfeasor for the portion of a settlement attributable to noneconomic damages. Wengert relied on the purported rule that the right of indemnity can arise only upon payment of a joint obligation. (Id. at p. 1448, 95 Cal.Rptr.2d 68.) This same purported rule, usually expressed in terms of a joint and several obligation, is repeated in numerous opinions.[15] The statement originated in Munoz v. Dams (1983) 141 Cal.App.3d 420, *70 425, 190 Cal.Rptr. 400: "Whatever confusion may have existed in the case law of equitable indemnity ... one point stands clear: there can be no indemnity without liability. In other words, unless the prospective indemnitor and indemnitee are jointly and severally liable to the plaintiff there is no basis for indemnity. (Columbus Line, Inc. v. Gray Line Sight-Seeing Companies Associated, Inc. (1981) 120 Cal. App.3d 622, 628 [174 Cal.Rptr. 527].)"[16] This passage assumes ("In other words ...") that a prospective indemnitor who is liable for an injury is jointly and severally liable together with the prospective indemnitee. That ordinarily was true before the passage of Proposition 51 in 1986, but is no longer true with respect to noneconomic damages.
Munoz v. Davis, supra, 141 Cal.App.3d 420, 190 Cal.Rptr. 400 was a pre-Proposition 51 legal malpractice action in which the plaintiff alleged that the defendant attorney failed to file a complaint against a negligent driver within the limitations period. (Id. at p. 422, 190 Cal.Rptr. 400.) The attorney filed a cross-complaint for equitable indemnity against the driver alleging that any damages for which the attorney may be liable were a proximate result of the driver's negligence. (Ibid.) Munoz explained that each tortfeasor whose actions were a proximate cause of an indivisible injury is jointly and severally liable for the injury, and that a right of equitable indemnity can arise among multiple tortfeasors. (Id. at pp. 424-425, 190 Cal.Rptr. 400.) Munoz stated that the driver had no duty to protect the plaintiff from the risk of malpractice and that the monetary loss caused by the alleged malpractice was "entirely distinct" from the physical injury caused by the driver. (Id. at p. 427, 190 Cal.Rptr. 400.) The attorney and driver therefore were not liable to the plaintiff for the same injury. Munoz concluded that the attorney could not recover equitable indemnity from the driver because "there can be ho indemnity without liability." (Id. at p. 425, 190 Cal.Rptr. 400.)
Munoz v. Davis, supra, 141 Cal.App.3d 420, 190 Cal.Rptr. 400 also stated, "unless the prospective indemnitor and indemnitee are jointly and severally liable to the plaintiff there is no basis for indemnity" (id. at p. 425, 190 Cal.Rptr. 400) and, "no basis for equitable indemnity exists between the driver and the attorney because they are not jointly and severally liable for the same injury" (id. at p. 427, 190 Cal.Rptr. 400). In my view, those references to joint and several liability reflect an assumption that tortfeasors liable to the plaintiff for the same injury are jointly and severally liable, as was the general rule before Proposition 51. Despite the references to joint and several liability, however, the ratio decidendi and basis for the decision in Munoz was that the prospective indemnitor and indemnitee were not liable to the plaintiff for the same injury.[17]
*71 The citation to Columbus Line, Inc. v. Gray Line Sight-Seeing Companies Associated, Inc., supra, 120 Cal.App.3d at page 628, 174 Cal.Rptr. 527 in the passage from Munoz v. Davis, supra, 141 Cal.App.3d 420, 190 Cal.Rptr. 400 quoted ante supports this conclusion. Columbus Line held that equitable indemnity was not available because the prospective indemnitor and indemnitee were not liable to the plaintiff for the same injury: "Inasmuch as that doctrine presupposes that each of two persons is made responsible by law to an injured party [citation], Gray Lines' obligation to indemnify Columbus depends upon its having been at least partially responsible for plaintiffs' injuries.... [N]o such responsibility existed." (Columbus Line, supra, at p. 628, 174 Cal.Rptr. 527.)
I would construe Munoz v. Davis, supra, 141 Cal.App.3d 420, 190 Cal.Rptr. 400 in accordance with its specific holding. So construed, Munoz is consistent with the conclusion that on a claim for equitable indemnity, a settling tortfeasor can recover from a nonsettling tortfeasor the portion of a settlement attributable to noneconomic damages, only if the tortfeasors were responsible for the same indivisible injury. In my view, therefore, the reliance on Munoz in Wengert, supra, 79 Cal.App.4th 1444, 95 Cal.Rptr.2d 68 was misplaced.
Wengert, supra, 79 Cal.App.4th at pages 1447-1448, 95 Cal.Rptr.2d 68 also explained that equitable indemnity is not available to a volunteer who has no reasonable belief that a settlement is necessary to protect itself from potential liability. "`Equitable indemnity, like subrogation, is not available to a volunteer. It extends to those who pay in performance of a legal duty in order to protect their own rights or interests.... However, one acting in good faith in making payment under a reasonable belief that it is necessary to his protection is entitled to indemnity or subrogation, even though it develops that he in fact had no interest to protect....' [Citations.]" (Ibid.) Wengert concluded that because each defendant could be severally liable only for its own share of noneconomic damages, the settling defendants "could not have reasonably believed they were protecting their own interests when they purported to settle all the [plaintiffs'] claims." (Id. at p. 1448, 95 Cal.Rptr.2d 68.) The court explained, "When liability is 'several only and ... not joint,' we see no justification for permitting one defendant to satisfy the liability of another and then seek to recover for a payment it was never obliged to make." (Id. at p. 1449, 95 Cal. Rptr.2d 68.) I disagree with Wengert's reasoning. The fact that the noneconomic portion of a settlement exceeded the settling defendant's apportioned share of noneconomic damages as later determined by the trier of fact does not compel the conclusion that the settling defendant had no reasonable belief that the settlement was necessary to protect its own interests. Moreover, the question is not whether the settling defendant was "obliged to make" *72 (ibid.) the payment on behalf of another tortfeasor, but whether the settling defendant reasonably believed that it was protecting its own interests by settling to avoid an uncertain liability.

c. Western Steamship Lines, Inc. v. San Pedro Peninsula Hospital

Western Steamship, supra, 8 Cal.4th 100, 32 Cal.Rptr.2d 263, 876 P.2d 1062 involved an indemnity action by a cruise ship operator against a hospital after the cruise ship operator had settled a personal injury action in Florida by an injured employee. Western Steamship held that a statutory limitation on the hospital's liability to an injured party for noneconomic damages also limited the hospital's liability for equitable indemnity. Civil Code section 3333.2 limits the amount of noneconomic damages against a health care provider in an action for professional negligence to $250,000. The court concluded that the purposes of the limitation on liability would be served only if the limitation applied not only in an action for professional negligence, but also in an equitable indemnity action based on professional negligence. (Western Steamship, supra, at p. 112, 32 Cal.Rptr.2d 263, 876 P.2d 1062.) The court also relied on the principle that "`there can be no indemnity without liability'" (id., at p. 114, 32 Cal.Rptr.2d 263, 876 P.2d 1062, quoting Munoz v. Davis, supra, 141 Cal. App.3d at p. 425, 190 Cal.Rptr. 400) and concluded that any limitation on liability that would apply to the claim of the injured plaintiff also applied in an action for equitable indemnity. (Id. at pp. 114-115, 32 Cal.Rptr.2d 263, 876 P.2d 1062.) Western Steamship explained that the hospital would not have been responsible to pay the injured party noneconomic damages in excess of $250,000, so the cruise ship operator's payment of noneconomic damages in excess of that amount in settlement did not relieve the hospital of a liability that the hospital otherwise would have incurred. (Id. at pp. 116-117, 32 Cal.Rptr.2d 263, 876 P.2d 1062.) The court concluded that the hospital was not unjustly enriched by the payment of damages for which it could not be liable, that there was no basis for restitution for that payment, and that therefore there was no equitable basis for equitable indemnity for that payment. (Ibid.)
Western Steamship, supra, 8 Cal.4th at page 114, 32 Cal.Rptr.2d 263, 876 P.2d 1062 cited Munoz v. Davis, supra, 141 Cal.App.3d 420, 190 Cal.Rptr. 400 using language that I believe has been misconstrued:[18] "We find further support for our conclusions in the fundamental principle that `there can be no indemnity without liability.' (Munoz v. Davis, supra, 141 Cal.App.3d at p. 425, 190 Cal.Rptr. 400; GEM Developers v. Hallcraft Homes of San Diego, Inc. (1989) 213 Cal.App.3d 419, 430 [261 Cal.Rptr. 626]; Colich, supra, 198 Cal.App.3d at p. 1236, 244 Cal.Rptr. 714; Allis-Chalmers Corp. v. Superior Court (1985) 168 Cal.App.3d 1155, 1159 [214 Cal. Rptr. 615].) Indemnity does not invariably follow fault; it is premised on a joint legal obligation to another for damages. Accordingly, as against the indemnitee, the indemnitor can invoke any substantive defense to liability that would be available against the injured party." Although Munoz and the other opinions cited in the quoted passage all stated that the prospective *73 indemnitor and indemnitee must be "jointly and severally liable" or that there must be "joint and several liability" (Munoz, supra, 141 Cal.App.3d at p. 425, 190 Cal.Rptr. 400; GEM Developers, supra, 213 Cal.App.3d at p. 430, 261 Cal. Rptr. 626; Colich, supra, 198 Cal.App.3d at p. 1236, 244 Cal.Rptr. 714; Allis-Chalmers, supra, 168 Cal.App.3d at p. 1159, 214 Cal.Rptr. 615), Western Steamship referred to "a joint legal obligation" and described the statutory limitation as a limitation on the "joint liability" of the indemnitor and indemnitee.[19] (Western Steamship, supra, 8 Cal.4th at pp. 115, 116, 32 Cal.Rptr.2d 263, 876 P.2d 1062.) Despite those references to joint liability, Western Steamship did not deny indemnification for noneconomic damages in excess of $250,000 on the ground that there can be no indemnification for payment of a several liability. Western Steamship did not discuss the question whether a tortfeasor can recover equitable indemnity from another tortfeasor for the portion of a settlement attributable to noneconomic damages, but dispensed with the proposition that Proposition 51 might affect the right of equitable indemnity by stating: "We note that under Civil Code section 1431.2, liability for noneconomic damages `shall be several only and shall not be joint.' (Id., subd. (a).) That provision does not apply to the facts of this case; therefore, we have no occasion to consider any impact it might have on the rule we announce today." (Western Steamship, supra, at p. 117, fn. 14, 32 Cal.Rptr.2d 263, 876 P.2d 1062.)
I construe the reference in Western Steamship, supra, 8 Cal.4th at page 114, 32 Cal.Rptr.2d 263, 876 P.2d 1062 to "a joint legal obligation to another for damages" to mean not a joint liability or a joint and several liability in the strict legal sense, but more generally a mutual obligation to pay damages for the same injury. (See Molko v. Holy Spirit Assn. (1988) 46 Cal.3d 1092, 1128, 252 Cal.Rptr. 122, 762 P.2d 46 [stating that equitable indemnity required "some claim of mutual liability for the same harm"], disapproved on another point in Aguilar v. Atlantic Richfield Co. (2001) 25 Cal.4th 826, 853, fn. 19, 107 Cal.Rptr.2d 841, 24 P.3d 493.) Such understanding of the quoted language is consistent with the holding in Western Steamship, which did not turn on the fact that the parties' liability for noneconomic damages was only several.

d. Any Equitable Indemnity in Favor of Gold's Gym Is Not Limited to the Portion of the Settlement Attributable to Economic Damages

In light of the foregoing, I would conclude that any right of equitable indemnity that Gold's Gym may establish against Flex on remand should not be limited to the portion of its settlement attributable to economic damages, but should also encompass the portion attributable to noneconomic damages.

CONCLUSION
There are two principal points made by this concurring opinion that I wish to underscore. First, Proposition 51 rejected the common law rule of complete joint and several liability for joint tortfeasors and replaced it with a rule limiting a defendant's liability for noneconomic damages to only several liability in direct proportion to that defendant's share of fault. Contrary to Wimberly, supra, 56 Cal.App.4th 618, 65 Cal.Rptr.2d 532, the defendants' liability in *74 a strict products liability action is "based upon principles of comparative fault" within the meaning of Civil Code section 1431.2, subdivision (a), as the term "comparative fault" has been interpreted by the California Supreme Court and was understood by the voters. I see no legitimate basis to except strict products liability from the application of Proposition 51.
Second, contrary to Espinoza, supra, 9 Cal.App.4th 268, 11 Cal.Rptr.2d 498, Hock, supra, 24 Cal.App.4th 48, 29 Cal. Rptr.2d 615, and their progeny, I believe that section 877 requires a setoff of the noneconomic portion of a good faith settlement to the extent necessary to avoid a double recovery by the plaintiff. Proposition 51 neither expressly nor impliedly repealed the setoff requirement with respect to noneconomic damages. Moreover, such a construction would eliminate the fortuity of a plaintiffs windfall double recovery, assure a fair and equitable distribution of the loss among multiple responsible defendants (including the settling defendant's right of indemnity), and provide a significant incentive to settlement of claims that is clearly not present under Espinoza and Hoch.
The Supreme Court has yet to address either of these important issues. This case presents an excellent opportunity for it to do so.
NOTES
[*] Pursuant to California Rules of Court, rules 8.1100 and 8.1110, this opinion is certified for partial publication with the exception of Part 1 of the Discussion.
[1] Proposition 51 was an initiative measure adopted by the voters in 1986 that amended Civil Code section 1431 and added sections 1431.1 through 1431.5.
[2] In orally presenting to the court the agreed settlement with Gold's Gym, Bostick's counsel set forth in detail how the $7.3 million payment was to be distributed:

1. $2,920 million was to be paid to Bostick's attorneys;
2. $150,000 was to be put in the trust account of Bostick's attorneys towards costs incurred;
3. $1,230 million was to be paid to Bostick through his attorneys' trust account;
4. $3 million was to be paid to a structured settlement company designated by Bostick and his attorneys.
[3] Unless otherwise indicated, all statutory references are to the Code of Civil Procedure.
[4] Section 877.6, subdivision (c) bars any claim for equitable indemnity by a nonsettling tortfeasor against a settling tortfeasor, but the statute does not preclude a claim for equitable indemnity by a settling tortfeasor against a nonsettling tortfeasor.
[**] See footnote *, ante.
[7] Although the jury was instructed in negligence as well as strict products liability and it found that Flex was liable under both theories, we view the negligence here as encompassed within the cause of action for strict products liability because the negligence at issue involved the design and manufacture of the defective product that caused Bostick's personal injuries.
[8] To the extent that Daly v. General Motors Corp., supra, 20 Cal.3d at page 742, 144 Cal. Rptr. 380, 575 P.2d 1162 applies the term "comparative fault" in strict products liability as a basis for reducing the damages assessed against a defendant by the comparative fault of the plaintiff, such an analysis is inapplicable here, and is inconsistent with the purposes of Proposition 51 as enunciated by the voters in its language.

As stated previously, Proposition 51 was adopted to eliminate inequities that existed under the system of joint and several liability where defendants, who were perceived to have "deep pockets" or had insurance coverage, were included in litigation "even though there was little or no basis for finding them at fault," and that defendants were held liable for all the damage even when they were found to share only "a fraction of the fault." (§ 1431.1, subd. (b).) To remedy these inequities, Proposition 51 sought to hold defendants in tort actions financially liable in closer proportion to their degree of fault. (§ 1431.1, subd. (c).) The language of Proposition 51 is clear on its face: It was intended to apply to defendants and only when their fault is comparable. This analysis is compatible both with the public policy behind strict products liability as explained in Wimberly, namely to place the costs associated with a defective product on those who are most able to absorb them (56 Cal.App.4th at pp. 630-633, 65 Cal.Rptr.2d 532), and with the intent of Proposition 51 as clearly enunciated in sections 1431.1 through 1431.5.
[9] Arena v. Owens-Corning Fiberglas Corp. (1998) 63 Cal.App.4th 1178, 74 Cal.Rptr.2d 580 and Wilson v. John Crane, Inc., supra, 81 Cal.App.4th 847, 97 Cal.Rptr.2d 240 are distinguished. Arena "determine[d] that Proposition 51 is applicable in a strict liability asbestos exposure case where multiple products cause the plaintiffs injuries and the evidence provides a basis to allocate liability for noneconomic damages between the defective products." (Arena, supra, at p. 1198, 74 Cal. Rptr.2d 580.) Wilson, another asbestos case with multiple products causing the plaintiff's injury, followed Arena, which was from the same appellate district. (Wilson, supra, at pp. 852, 859, 97 Cal.Rptr.2d 240.) As noted, this case involves a single defective product and all defendants are in the same chain of distribution of that product.
[1] I also concur in the unpublished part of the majority opinion rejecting Flex's challenges to the award of noneconomic damages.
[2] As originally enacted, section 877 stated: "Where a release, dismissal with or without prejudice, or a covenant not to sue or not to enforce judgment is given in good faith before verdict or judgment to one or more of a number of tortfeasors claimed to be liable for the same tort[¶] (a) It shall not discharge any other such tortfeasor from liability unless its terms so provide, but it shall reduce the claims against the others in the amount stipulated by the release, the dismissal, or the covenant, or in the amount of the consideration paid for it whichever is the greater; and [¶] (b) It shall discharge the tortfeasor to whom it is given from all liability for any contribution to any other tortfeasors." (Stats. 1957, ch. 1700, § 1, p. 3077.)
[3] Code of Civil Procedure sections 875 and 876 provide for a right of contribution, and section 877 states that a settlement made in good faith before verdict or judgment "shall not discharge any other such party from liability unless its terms so provide" (§ 877 & subd. (a)).
[4] American Motorcycle, supra, 20 Cal.3d at page 604, 146 Cal.Rptr. 182, 578 P.2d 899 held that the strong public policy in favor of encouraging settlement underlying section 877 compelled the conclusion that a tortfeasor who enters into a good faith settlement with the plaintiff must be discharged from liability for equitable indemnity as well, and that in that event the plaintiff's recovery from nonsettling defendants must be reduced only by the amount of the settlement rather than by the settling defendant's apportioned share of liability. Code of Civil Procedure section 877.6, subdivision (c) later codified the rule that a good faith settlement relieves the settling defendant of liability for equitable indemnity.
[5] This result can De achieved in any case by the following calculations that reduce the plaintiff's claims against nonsettling defendants in accordance with section 877 and determine the amounts of economic and noneconomic damages to award the plaintiff in an action subject to Proposition 51:

1. Reduce the total damages award by the plaintiff's apportioned share and the total amount of good faith settlements:
 - total damages award
 - plaintiff's apportioned share
 - total amount of good faith settlements
 _____________________________________________
 = Reduced Award
2. Determine the economic portion of the Reduced Award by multiplying the Reduced Award by the ratio of total economic damages to the total damages award:
 Reduced Award
 x total economic damages
 ÷ total damages award:
 _________________________
 = Reduced Economic Award
3. Determine the noneconomic portion of the Reduced Award by multiplying the Reduced Award by the ratio of total noneconomic damages to the total damages award:
 Reduced Award
 x total noneconomic damages
 ÷ total damages award
 ____________________________
 = Reduced Noneconomic Award
4. Determine a preliminary noneconomic damages award against each nonsettling defendant by apportioning the Reduced Noneconomic Award among the nonsettling tortfeasors:
 Reduced Noneconomic Award
 x defendant's % of fault
 ÷ (100 percentcombined % of fault of
 plaintiff
 and of all defendants settling in good faith)
 _____________________________________________
 - Preliminary Noneconomic Award
5. Determine the maximum noneconomic damages award against each nonsettling defendant that is permissible under Proposition 51:
 defendant's % of fault
 x total noneconomic damages
 _____________________________
 = Proposition 51 Limit
6. Enter a judgment awarding the Reduced Economic Award against the defendants jointly and severally and awarding against each defendant severally the lesser of the Preliminary Noneconomic Award or the Proposition 51 Limit applicable to that defendant.
[6] Bostick understandably relies on this line of cases. In addition, he also cites DaFonte, supra, 2 Cal.4th 593, 7 Cal.Rptr.2d 238, 828 P.2d 140 for the proposition that in an action subject to Proposition 51, the setoff for workers' compensation benefits paid to the plaintiff cannot include noneconomic damages. Bostick argues that workers' compensation benefits are analogous to a settlement and that the same rule should apply here. I disagree. DaFonte held that pursuant to Proposition 51, a defendant in an action by an injured employee could not be held liable for any part of the noneconomic damages attributable to the employer, who was immune from suit (Lab.Code, § 3602, subd. (a)). (DaFonte, supra, at pp. 596, 604, 7 Cal.Rptr.2d 238, 828 P.2d 140.) Contrary to Bostick's argument, DaFonte did not decide how to reduce the damages award in light of Proposition 51. (hi. at p. 604. 7 Cal.Rptr.2d 238, 828 P.2d 140.) Moreover, the common law rule governing the amount of a setoff for workers' compensation benefits paid differs from the requirements of section 877 applicable to a good faith settlement. (See DaFonte, supra, at p. 599, 7 Cal.Rptr.2d 238, 828 P.2d 140.)
[7] In re Piper Aircraft (N.D.Cal.1992) 792 F.Supp. 1189, 1192, decided before Espinoza, supra, 9 Cal.App.4th 268, 11 Cal.Rptr.2d 498, similarly held that noneconomic damages are not subject to setoff after Proposition 51 because a defendant's liability for noneconomic damages is only several.
[8] "Our conclusion is based, first, on the relevant language of section 877(a), which presupposes the existence of multiple defendants jointly liable for the same damages. The settlement by one or more of several tortfeasors 'claimed to be liable for the same tort' reduces 'the claims against the others.' Under the scheme of purely several liability created by section 1431.2(a), however,'... a personal injury plaintiff's valid "claim" against one such tortfeasor for noneconomic damages can never be the liability of "the others." ... Thus, there is no longer any such claim "against the others" to "reduce."' (Espinoza v. Machonga, supra, 9 Cal.App.4th at pp. 274-275, 11 Cal.Rptr.2d 498.)" (Hoch, supra, 24 Cal.App.4th at p. 63, 29 Cal.Rptr.2d 615.)
[9] "Each defendant shall be liable only for the amount of non-economic damages allocated to that defendant in direct proportion to that defendant's percentage of fault, and a separate judgment shall be rendered against that defendant for that amount." (Civ.Code, § 1431.2, subd. (a).)
[10] Poire v. C.L. Peck/Jones Brothers Construction Corp., supra, 39 Cal.App.4th at page 1838, 46 Cal.Rptr.2d 631 also explained: "[E]ach defendant is solely responsible for its share of noneconomic damages under Civil Code section 1431.2. Therefore, a nonsettling defendant may not receive any setoff under section 877 for the portion of a settlement by another defendant that is attributable to noneconomic damages. (See Espinoza, supra, 9 Cal.App.4th at pp. 274-275, 11 Cal.Rptr.2d 498; Hoch, supra, 24 Cal.App.4th at p. 63, 29 Cal.Rptr.2d 615.)" (Accord, McComber v. Wells, supra, 72 Cal.App.4th at p. 518, 85 Cal.Rptr.2d 376.)
[11] I disagree with the opinions holding or suggesting that a settling tortfeasor cannot recover equitable indemnity from a nonsettling tortfeasor for the portion of a settlement attributable to noneconomic damages, as discussed in section 3, post.
[12] Without even considering the possibility of retaining the benefit of a high settlement, the plaintiff, in a multiple-defendant tort case, may have several substantial reasons to settle with fewer than all of the defendants in addition to the incentives already mentioned. For example, and without suggesting that this a comprehensive list, such reasons might include: (1) the establishment of a "war chest" with which to prosecute the claim against the remaining defendants, (2) disposal of the claim as against the settling defendant who may have a lesser or questionable liability or limited financial resources, (3) obtaining the cooperation or assistance of the settling defendant with respect to discovery or evidentiary issues in the prosecution of the claim against the remaining defendants, and (4) receiving an immediate partial recovery on the claim without further risk, delay, or expense.
[13] It should be noted that when there is only a single nonsettling tortfeasor, as is the case here, this calculation will always result in a multiplier of 1, so the "reduced noneconomic award" and the "preliminary noneconomic award" against that tortfeasor will be the same.
[14] "`The basis for indemnity is restitution, and the concept that one person is unjustly enriched at the expense of another when the other discharges liability that it should be his responsibility to pay.'" (Western Steamship, supra, 8 Cal.4th at p. 108, 32 Cal.Rptr.2d 263, 876 P.2d 1062, quoting Rest.2d Torts, § 886B, com. c, p. 345.)
[15] Opinions stating the purported rule include, among others, BFGC Architects Planners, Inc. v. Forcum/Mackey Construction, Inc. (2004) 119 Cal.App.4th 848, 852, 14 Cal. Rptr.3d 721 ("The doctrine applies only among defendants who are jointly and severally liable to the plaintiff"), Leko v. Cornerstone Bldg. Inspection Service (2001) 86 Cal. App.4th 1109, 1115, 103 Cal.Rptr.2d 858 ("Joint and several liability is a prerequisite for equitable indemnity"), and GEM Developers v. Hallcraft Homes of San Diego, Inc. (1989) 213 Cal.App.3d 419, 430, 261 Cal.Rptr. 626 (GEM Developers) ("`"[T]here can be no indemnity without joint and several liability by the prospective indemnitor and indemnitee"'").
[16] Numerous opinions quote this passage in full or in part, including Major Clients Agency v. Diemer (1998) 67 Cal.App.4th 1116, 1126, 79 Cal.Rptr.2d 613, Long Beach Grand Prix Assn. v. Hunt (1994) 25 Cal.App.4th 1195, 1198, 31 Cal.Rptr.2d 70, Selma Pressure Treating Co. v. Osmose Wood Preserving Co. (1990) 221 Cal.App.3d 1601, 1612, 271 Cal.Rptr. 596, Yamaha Motor Corp. v. Paseman (1990) 219 Cal.App.3d 958, 964, 268 Cal.Rptr. 514, Colich & Sons v. Pacific Bell (1988) 198 Cal. App.3d 1225, 1236, 244 Cal.Rptr. 714 (Colich), and Allis-Chalmers Corp. v. Superior Court (1985) 168 Cal.App.3d 1155, 1159, 214 Cal.Rptr. 615.
[17] The Ninth Circuit in Hydro-Air Equipment, Inc. v. Hyatt Corp. (9th Cir. 1988) 852 F.2d 403, 406 and footnote 4 reached the same conclusion regarding the true holding in Munoz v. Davis, supra, 141 Cal.App.3d 420, 190 Cal.Rptr. 400. It appears that in all of the opinions, other than Wengert, supra, 79 Cal. App.4th 1444, 95 Cal.Rptr.2d 68 and its progeny (e.g., Marina Emergency Medical Group v. Superior Court (2000) 84 Cal.App.4th 435, 440, 100 Cal.Rptr.2d 866 followed Wengert) that have restated the purported rule from Munoz that equitable indemnity requires joint and several liability, the statement was nothing more than an imprecise statement of the rule that a right of equitable indemnity can arise only if the prospective indemnitor and indemnitee could be held liable to the plaintiff for the same injury. (E.g., BFGC Architects Planners, Inc. v. Forcum/Mackey Construction, Inc., supra, 119 Cal.App.4th at p. 852, 14 Cal.Rptr.3d 721; Leko v. Cornerstone Bldg. Inspection Service, supra, 86 Cal.App.4th at pp. 1115-1117, 103 Cal.Rptr.2d 858; Major Clients Agency v. Diemer, supra, 67 Cal. App.4th at p. 1131, 79 Cal.Rptr.2d 613; GEM Developers, supra, 213 Cal.App.3d at pp. 430-431, 261 Cal.Rptr. 626; Colich, supra, 198 Cal.App.3d at p. 1236, 244 Cal.Rptr. 714.)
[18] Wengert, supra, 79 Cal.App.4th at page 1448, 95 Cal.Rptr.2d 68 cited Western Steamship, supra, 8 Cal.4th at page 114, 32 Cal. Rptr.2d 263, 876 P.2d 1062 and relied on the Supreme Court's reference to a "joint legal obligation" in support of Wengert's holding that a tortfeasor cannot recover equitable indemnity from another tortfeasor for the portion of a settlement attributable to noneconomic damages.
[19] Civil Code section 1430 distinguishes a joint obligation, a several obligation, and a joint and several obligation.